THE DELAWARE STEEPLECHASE AND RACE ASSOCIATION, a Corporation of the State of Delaware, Defendant Below, Plaintiff in Error, v. WILLIAM ARTHUR WISE, Plaintiff Below, Defendant in Error.

*(July* 13, 1942.)

HARRINGTON, Chancellor, RICHARDS and TERRY, J. J., sitting.

*Clarence A. Southerland* and *George Gray Thouron* for Defendant Below, Plaintiff in Error.

*David J. Reinhardt, Jr.,* for Plaintiff Below, Defendant in Error.

Supreme Court, No. 2, June Term, 1941.

HARRINGTON, Chancellor:

This case involves the construction of the Delaware Racing Statute.

Section 17 of Article 2 of the Constitution of the State originally provided:

"The sale of lottery tickets, pool selling and all other forms of gambling are prohibited in this State. The General Assembly shall enforce this Section by appropriate legislation."

By an amendment, which became effective in 1935, (Chapt. 2, Vol. 38, Laws of Delaware; Chapt. 1, Vol. 40, Laws of Delaware), the same section now provides:

"The sale of Lottery Tickets, pool selling and all other forms of gambling are prohibited in this State; except wagering or betting on races at race tracks by the use of pari-mutuel machines or totalizators in connection therewith.

"The General Assembly shall enforce this Section by appropriate legislation."

Under that Section "wagering or betting on races at race tracks by the use of pari-mutuel machines or totalizators in connection therewith" is, therefore, expressly excepted from the general constitutional prohibition against

gambling, and may be provided for by appropriate legislative action.

Consequently, the General Assembly enacted Chapter 62, Volume 38, Laws of Delaware, usually known as the Racing Statute. That Act, as amended February 6th, 1935, by Chapter 112, Volume 40, Laws of Delaware, is incorporated in Chapter 163 of the Revised Code of 1935. It provides for the regulation, control and licensing of horse racing in the State of Delaware, for the creation of a Racing Commission, and prescribes its powers and duties. Section 5510 of the Revised Code, now Section 15 of the Racing Act, as amended by Chapter 112, Volume 40, Laws of Delaware, is the important section. It provides:

1. "Within the enclosure of any horse race meeting licensed and conducted under this Chapter, but not elsewhere, the wagering or betting on horse races by the use of pari mutuel machines or totalizators is hereby authorized and permitted."

2. "The Delaware Racing Commission shall have power in its discretion, to grant a license or licenses to any person, firm or corporation, to make, conduct and sell pools by the use of pari mutuel machines or totalizators, for the purpose of receiving wagers or bets on horse races within the enclosure of any race meeting licensed and conducted under this Chapter, but not otherwise, under such regulations as the Commission shall prescribe."

3. "The Commission shall have power to prescribe regulations governing the granting of applications for licenses, the granting of licenses, and the conditions under which any licensee may conduct, sell or make any such pool."

4. "The Delaware Racing Commission may authorize

commissions on pari-mutuel or totalizator pools to the person, firm, or corporation operating the race meet, provided, however, that in no event and at no track licensed under this Chapter shall said commissions, when added to the amount payable to the Delaware Racing Commission from such pools, for the use of the State of Delaware, exceed six per cent of the total contributions to all pari mutuel or totalizator pools conducted or made upon any track, plus the odd cents of all redistributions to be made on all pari mutuel or totalizator pool contributions exceeding a sum equal to the next lowest multiple of five".

The real controversy relates to the precise meaning of that part of the statute which authorizes the Racing Commission to permit the deduction of commissions "on pari mutuel or totalizator pools", not exceeding 6% "of the total contributions to all pari mutuel or totalizator pools conducted or made upon any track, plus the odd cents of all redistributions to be made on all pari mutuel or totalizator pool contributions exceeding a sum equal to the next lowest multiple of five".

The Delaware Steeplechase and Race Association, the plaintiff in error, is a licensee of the State Racing Commission; but does not use pari mutuel machines at Delaware Park. It receives wagers and conducts pools on the various races run by means of a totalizator. The mechanism used is somewhat different from that of the pari mutuel machines, but the basic principle of the system is the same, namely: "through the method of placing all wagers on a particular event in a common pool, the net proceeds of which, after deducting certain authorized expenses and charges, are divided among the successful bettors on an equal basis, i. e., in proportion to the amount of their respective bets". In theory, therefore, whether a pari mutuel machine or a totalizator is used, all money "staked by backers

is pooled, and, when the result of a race is shown, shared by those who have backed the winners". A totalizator is nothing more than a machine of a particular kind, designed for the operation of pari mutuel betting. It is a mechanical device which automatically and instantaneously records and adds the sums of money wagered on the various horses, and prior to each race an electric display board, operated in connection therewith, disseminates that information. At the end of each race, information, as to the result and the amount due the winner on each $2.00 wager, is likewise given on that board. Naturally, changes in the mechanical operation of the totalizator have been made from time to time, and an improved machine is used at Delaware Park, but the basic principle of the pari mutuel system of betting remains unchanged. The sole material effect of the use of a totalizator is to substitute an electric adding machine in making calculations, formerly made by individuals. Wagers are only accepted by the Race Association in the amounts of $2, $5, $10 and $50, and tickets are issued accordingly. They are delivered at the respective windows receiving such bets by an automatic vending machine, which, also, forms a part of the totalizator. A bet can be made in one of three ways: that the horse will win, "straight"; that he will finish either first or second, "place"; or that he will finish either first, second or third, "show". The three pools are kept entirely separate. No holder of a winning "place" or "show" ticket shares in the net proceeds of the "straight" pool. Pursuant to the express provisions of the Racing Statute, every winning pool contributed to by the public is first subject to certain deductions for taxes, payable to the State, and to commissions, due the Race Association. The correctness of the deductions made pursuant to this provision is not questioned. While $1.00 bets or wagers cannot be made at Delaware Park, the calculations, with respect to the shares of the holders of such tickets, are first made on that basis. In

order to ascertain the amount due, that precise amount would naturally be multiplied by the number of dollars wagered, as shown by a particular winning ticket. In many cases, the amount appearing to be due on the basis of $1.00 is not divisible by five. In administering the pari-mutuel system of betting in this country, it has been the universal custom for upwards of thirty years for the promoters of the race to deduct the odd cents, exceeding an amount equal to the next lowest multiple of five, before any multiplication is made, in order to ascertain the amount due on a particular winning ticket. The Race Association, the plaintiff in error, followed that custom at Delaware Park, claiming that the real meaning of the statutory provision could only be ascertained by reading it in connection with that established custom. That practice was known to the Racing Commission and to Wise, the plaintiff below, when he placed his bet. It is agreed that "such a deduction is an invariable concomitant of the pari-mutuel or totalizator method of betting and is colloquially termed 'breakage' or the 'breaks'"; that, independent of statute, a deduction in that manner invariably accompanies the operation of the pari mutuel system. Furthermore, it is agreed that "the practice of deducting 'breakage' from pool winnings, in connection with the pari mutuel system of betting, has existed from the beginning of the system itself, due, in part, to the necessity of providing a fund for the operation of the race course, prizes for winning horses, etc., and, in part, to considerations of speed and convenience". In this country, it seems, however, that the amount that can be so deducted is frequently regulated by statute, and, therefore, varies somewhat in different jurisdictions.

The display board, heretofore mentioned as a part of the totalizator now used, is erected in the infield, and gives information only as to the amount payable on $2.00 win-

ning tickets. The holder of a $5.00 ticket may, however, readily compute the amount due thereon by multiplying the amount shown on the board by two and one-half. He may, also, acquire the necessary information, as to the amount due him, from a board erected near the cashier's stand. As yet, no totalizator has been manufactured in this country with a board which affords either equipment or space for the display of the precise amounts payable on $5, $10, and $50 tickets. It appears from the agreed facts that "if it were necessary to show the amounts payable in respect of the four tickets of different denominations, three additional display boards, each of which is about twenty feet long, would be required * * *. Additional curtailment of the spectator's view of the track would result". Such are the agreed facts which the Race Association claim are of vital importance in determining the meaning of both the Constitution, as amended, and the subsequent statutory provision. But to what extent they are material and controlling is for the Court to determine.

On May 29th, 1940, Wise wagered the sum of $5.00 at Delaware Park, by a single ticket, that a horse named "Bucking" running in the fifth race would "show"; that he would finish either first, second or third; "Bucking" was one of the first three to finish that race. As a holder of a winning ticket for $5.00, Wise was, therefore, enitled to his proper proportion of the show pool on that horse. The precise details of the whole calculation are unimportant. But it appears that each $1.00 wagered in that pool was entitled to receive $1.26 on the pay-off. That amount was not divisible by five; so, applying the old customary method of calculating and deducting "breakage", one penny was deducted before any multiplication was made, and was retained by the Race Association. Under that rule, the balance of $1.25 multiplied by five would indicate that $6.25 was due Wise

on his ticket, and that 5c had been retained by the Association. The $6.25 claimed to be due Wise was offered to him by the Association, but he refused to accept it. He subsequently brought suit to recover the whole amount claimed to be due him, and judgment was entered accordingly by the Court Below.

The statute provides for the deduction of "breakage", though it does not use that term; but the real question relates to the method of calculating it, and whether a general established usage can play a part in ascertaining the meaning of the language used. The real difference between the parties, as to the computation of breakage, is that under the method used by the Association it is deducted on the basis of each dollar bet, or five times on a $5.00 ticket; while, under the contention of Wise, it should be deducted according to the amount of each ticket purchased and contribution made. Wise, also, claims that as $6.30 is divisible by five, no breakage, whatever, can be deducted in this case.

Like other written instruments, ordinarily, the meaning of either a constitutional or a statutory provision must be ascertained from the language used. When, however, any such instrument is couched in ambiguous and uncertain language, pertinent, extrinsic, explanatory evidence may be frequently considered to aid in ascertaining its real intended meaning. *Cooley Const. Lim.* 141; 2 *Lewis' Sutherland Stat. Construct.*, 2nd Ed., Sec. 473; *Carter v. Liquid Carbonic, etc., Corp.* (9 *Cir.*) 97 *F.* 2d 1. This is particularly true when technical words are used. 2 *Lewis' Sutherland Stat. Const., Sec.* 393; 59 *C. J.* 979; *Douglas v. Edwards,* (2 *Cir.*) 298 *F.* 229. The Race Association relies on that general rule. It claims that in construing the statutory language in controversy we must bear in mind that the compound word "pari mutuel" is a technical term which designates not only a system of betting, but, also, prescribes and

defines the details of that system, including the prior admitted general customary method of calculating breakage when the statute was enacted. 2 *Lewis' Sutherland Stat. Const.*, *2d Ed., Sec.* 473. Somewhat the same argument is, also, made as to the constitutional provision, which removed the prior prohibition against the enactment of such a statute. Conceding that the compound word "pari mutuel" is a technical term, we are unable to agree with these contentions. There is no room for construction when the statutory language used is plain and unambiguous, and its meaning is clear and unmistakable. Rules of construction are used only in cases of doubt; they are never to be employed to create a doubt. *Russell Motor Car Co. v. United States et al.*, 261 *U. S.* 514, 43 *S. Ct.* 428, 67 *L. Ed.* 778. Extraneous evidence, such as usage or custom, may be considered only where there is ambiguity and uncertainty as to the real meaning of the words used; and when the statute is plain and explicit, and indicates a definite and sensible meaning, usage or custom, no matter how long continued, or how generally acquiesced in, cannot be seized upon to override the plain meaning conveyed by it. 2 *Lewis' Suther. Stat. Const.*, *2d Ed., Sec.* 473; 59 *C. J.* 1024; *Goldsborough v. United States, Fed. Cas. No.* 5,519. The latter rule is controlling.

The statute, permitting the pari mutuel system of gambling, in clear and explicit language, provides for a form of breakage to be deducted by the Race Association, somewhat more favorable to the betting public than the old customary method. The language used requires no explanation.

A "pari-mutuel or totalizator pool contribution" is the amount wagered by a particular ticket; a "redistribution" is the pay-off to the various holders of winning tickets, entitled to share in the pool. Both parties, perhaps, necessarily make their primary calculations on the

basis of $1.00; but there are no contributions to the pool of that amount, and under the language of the statute "breakage" cannot be computed accordingly.

The Court Below aptly pointed out that "a wager of $5.00 is a contribution of that amount to the pool, and no casuistry can make five $1.00 wagers out of one $5.00 wager". The few decided cases, construing somewhat similar statutory provisions, support this conclusion. *Feeney v. Eastern Racing Ass'n, Inc.*, 303 *Mass.* 602, 22 *N.E.* 2d 259; *Ballin v. Los Angeles County Fair*, 43 *Cal. App.* 2d *Supp.* 884, 111 *P.* 2d 753.

■ Apparently, the Delaware Steeplechase and Race Association does not directly question, on constitutional grounds, the validity of any part of the Racing Statute, under which it operates. It contends, however, that the real meaning of the technical, and, therefore, ambiguous word "pari mutuel", as used in Section 17, as amended, of Article 2 of the Constitution, is necessarily explained by the various customary usages, which were concomitants of the system long before the enactment of that section. It claims that such general usages are of a basic nature, composing an inherent part of that system of betting, and are not mere administrative details, accompanying its operation. Applying the principle, that a statutory enactment is always presumed to be in accord with the Constitution (*Collison v. State*, 9 *W. W. Harr.* (39 *Del.*) 460, 2 *A.* 2d 97, 119 *A.L.R.* 1422), the Association, therefore, draws the conclusion that the meaning of the word "pari mutuel", applied to the word "pools" in the statute, is, necessarily, explained by the real meaning of the same word in the Constitution.

The Constitution now permits legislation, authorizing betting on races "by the use of pari-mutuel machines or totalizators in connection therewith". It is agreed that no

matter which of the two authorized mechanical devices is used, the betting system is precisely the same. The present exception to the general constitutional prohibition against gambling is confined to bets, authorized by statute, according to that system; but the question is whether customary usages compose an essential part thereof.

■ Generally speaking, perhaps somewhat the same rules that are applied to aid in construing an ambiguous statute are, also, applied in construing an ambiguous constitutional provision. *Cooley's Const. Lim.* 141; 16 *C.J.S., Constitutional Law*, §§ 15, 29. Conceding that the various customary usage has accompanied the operation of the sys- recognized almost from the very beginning of the operation of the pari mutuel system, it does not follow that they are real essential elements of it. They were, apparently, adopted in part to facilitate speed in making calculations, and in part for the benefit of the promoters of the race, to aid them in procuring prizes, and otherwise. The deduction of "breakage" and a particular method of calculating it would merely be details of an administrative nature, and, ordinarily, would hardly be material functions of the system contemplated by the Constitution. That system of wagering would remain the same as one assuring practical fairness and equality if no breakage, whatever, were allowed. A question of intent is involved, and the fact that a particular customary usage has accompanied the operation of the system since its very beginning does not, necessarily, make it such an essential part thereof that the old customary method, or in fact any method, of deducting breakage must be provided for in any authorized legislative enactment. The primary function of a Constitution is to establish fundamentals rather than to regulate details.

■ Literally, the word "pari mutuel" means mutual stake or wager. Webster's Dictionary, Ref. Hist. Ed.

1931. In principle, that system is nothing more than a ratable division of the net pools among the successful contributors, in proportion to their respective contributions thereto. "Breakage" is not an essential part of it, and evidence of customary usages in connection therewith is not controlling. Nor is evidence, as to the type of display board customarily used at the track, of any greater importance. A modern and improved totalizator is now being used at Delaware Park, and further improvements cannot be regarded as impossible, or even improbable. The Race Association points out that the old customary method of computing "breakage" is the only method which will result in absolute equality in the pay-off to holders of winning tickets in a particular pool; for instance, that by any other method, the amounts payable to the holders of ten $2.00 tickets might, and in many cases would, be less than the amounts payable to the holders of two $10.00 tickets. Gambling, in any manner, is a game of chance, and absolute equality in the pay-off, in all cases, could hardly have been contemplated as a controlling principle. A fair reading of the agreed statement of facts does not support any such contention as a reason for the customary mode of calculating and deducting breakage. Under our established currency system, absolute equality would, perhaps, be impossible. Moreover, if a distribution on an equal basis were an essential part of the system, in principle it would seem that the customary deductions would be inconsistent with it. The Court Below, therefore, correctly concludes that what it terms "the permissive language of the Constitution may not be twisted into a mandate by which 'breakage' must be provided for" in any legislative enactment, permitting the use of the pari mutuel system of betting. But it does not follow that such an enactment cannot legally provide for some method of calculating and deducting "breakage"; whether, in all respects, according to the old customary method is, however,

unimportant. Such a conclusion would, necessarily, result from the principles heretofore announced. Any possible inferences that may be drawn from the language of the Court Below, to the effect that legislation, providing for the deduction of "breakage", no matter how calculated, is inconsistent with the meaning of the word "pari mutuel", as used in the Constitution, is, at most, a mere dictum.

The judgment of the Court Below is affirmed.