WILLIAM ARTHUR WISE,

*vs.*

THE DELAWARE STEEPLECHASE AND RACE ASSOCIATION.

*New Castle, September 27, 1944.*

*Albert L. Simon,* for complainant.

*Clarence A. Southerland,* of the firm of Southerland, Berl & Potter, and *Collins J. Seitz,* for defendant.

PEARSON, Vice-Chancellor: Defendant owns a horse racing park which it operates under a license from the Delaware Racing Commission. At race meetings during the years 1937 through 1940, pursuant to its license, it "conducted and sold pools by the use of a 'totalizator,' for the purpose of receiving wagers and bets on horse races." Complainant was a fortunate bettor in a number of these events. Defendant's practice in receiving bets and distributing pools was in accordance with the pari-mutuel system of betting, and is described in the opinions in a previous law action, brought by the present complainant against the present defendant. *Wise v. Delaware Steeplechase & Race Ass'n.,* 2 *Terry* 182, 18 *A.* 2d 419; *Delaware Steeplechase & Race Ass'n. v. Wise,* 2 *Terry* 587, 27 *A.* 2d 357. There, complainant successfully attacked defendant's method of computing a certain deduction, in calculating amounts payable to successful bettors. Here, complainant asks for relief relating to sums deducted under the method held erroneous in the law action.

A statute which was effective during the years in question, authorized the deduction of "the odd cents of all redistributions to be made on all pari-mutuel or totalizator pool contributions exceeding the sum equal to the next lowest multiple of five." 41 *Laws of Del., Chap.* 219, *pp.* 685-688; 42 *Laws of Del., Chap.* 163, *pp.* 328-332. In other words, although an exact division of a pool among successful bettors might require payments of sums ending in fractions

of a cent, or in any number of cents; by virtue of the statute, defendant was authorized to compute distributable portions or units "to the nearest nickel" (but never above the amount of an exact division), and to keep any odd cents remaining. The odd cents are generally known as "breakage."

Defendant accepted bets only in denominations of $2, $5, $10 and $50. Its method of determining the sum payable upon successful bets of each of these denominations may be viewed, for present purposes, as consisting of three operations. First, it calculated the amount available for payment with respect to each $1 of the total wagered by successful bettors in a given pool. Second, from the sum thus obtained, it deducted "breakage", thereby reducing the sum to an amount divisible by five. Third, it multiplied the resultant amount by 2, 5, 10 and 50, separately, to arrive at the respective amounts payable for each $2, $5, $10 and $50 successful wager. In the law action, it was held that this method was not authorized by the statute; that before deducting any odd cents, defendant should compute the amount otherwise payable on successful bets of each denomination; and that the breakage deduction should be made separately in the case of each such amount, instead of from the sum computed to be available for each $1 wagered. In brief, odd cents should be deducted as the third operation, instead of the second.

The two methods of computation may be illustrated by a wager described in the bill. At a race held in 1939, complainant bet $10 on a horse named "Maewhisk" to place (to finish either first or second). His bet was successful. The total sum which had been wagered on this horse was $2,883, and the amount distributable to the wagerers (before the breakage deduction) was $5,443.23. Defendant first divided the latter sum by the amount of the former, obtaining $1.888 plus, as the amount available for payment

with respect to each $1 wagered (before the breakage deduction). It then deducted the odd cents in the amount of $.038 plus, leaving $1.85 (the next lowest multiple of five of $1.888) as a basic distributable amount, after all deductions, for each $1 wagered in bets of all denominations. Lastly, to determine the amount payable for a $10 bet (the amount of complainant's wager), defendant multiplied the sum of $1.85 by 10, obtaining $18.50. This final sum was paid complainant upon the surrender of a ticket issued him when he made his bet.

Complainant correctly contends that this method was wrong, under the rule of the law action. After arriving at the amount of $1.888 plus, by the first operation, defendant should have multiplied this sum by 10, obtaining $18.88 (plus a fraction of a cent). Not until then was it proper to deduct breakage. The next lowest multiple of five of $18.88 being $18.85, the total breakage deduction should have been three cents plus, and complainant should have been paid $18.85, or 35 cents more than he received. From this illustration, it is apparent that in many instances the amount of odd cents deductible is greater (and never less) if made from the sum otherwise distributable upon each $1 wagered, than if made separately from the respective sums otherwise payable for each $2, $5, $10 or $50 successful wager.

Complainant alleges that during the years involved, he made more than 250 other successful bets, and for these was paid sums calculated in accordance with defendant's method; and consequently, suffered substantial financial losses. Referring to the successful bettors generally, he says:

"* * * the net result being that the defendant Association illegally retained under the guise of breakage and misappropriated sums of money in the aggregate approximating $200,000 from the various successful bettors. The exact number of said successful bettors is unknown, but on information and belief the said number of successful

bettors during said years is approximately 50,000, many of whom cannot be easily discovered or ascertained and many others of whom reside outside the State of Delaware. The exact number of winning tickets cashed by successful bettors during said four years at Delaware Park is unknown, but on information and belief is in excess of 800,000."

Paraphrasing other allegations, complainant avers that the various successful bettors during the above years are entitled to the sums illegally retained, and that defendant has been unjustly enriched at the expense of and to the detriment and deprivation of thousands of successful bettors. That the class of such persons is so numerous as to make it impracticable to bring all interested parties before the court. That the question presented by the bill is one of common or general interest to the members of that class, and that complainant is suing for himself and the entire class. He prays that an equitable lien be declared and enforced upon defendant's assets; that defendant account for all sums illegally retained by virtue of its method of computation; that when the total amount is ascertained, defendant be ordered to pay it to a receiver to be appointed by this court, for distribution among the persons entitled, as directed by this court.

Defendant demurred generally to the bill on the grounds that it is without equity; that it does not state a case entitling complainant to any relief against defendant in a court of equity; and that it appears from the bill that any claim which complainant or other persons may have had, is barred by the statute of limitations.

At the argument, and in his brief, complainant's principal contention is that the transactions involved in the making of bets at defendant's track gave rise to the creation of express trusts. He argues:

"* * * Each person who makes a wager at the defendants's race track, operated under the appropriate laws of the State of Delaware, makes a contribution to a pool which must be redistributed to the

holders of tickets on winning horses. When a bet is made, the better is the settlor of the trust and hands money to the defendant, who is the trustee, who holds the fund of money created by wagers on a particular race for the use and benefit of the class of persons who have selected horses which run first, second and third in the race. * * *

"It is contended by the complainant that the pool created by contributions of various bettors is the trust fund or res, which the defendant, as trustee, is under an obligation undertaken by it, as well as prescribed by Statute, to administer and pro rate among the successful contributors, after deducting the authorized expenses. The class of successful contributors are the beneficiaries of that trust fund.

"The transaction is a simple illustration of the elementary trust created by a person paying money to another for the use and benefit of a third person."

Complainant's present theory is that this is a proceeding for the enforcement of express trusts, within the exclusive jurisdiction of equity, and that the statute of limitations is inapplicable. It is apparent that the relief primarily sought is to require defendant to pay over to someone the total amount of the excessive breakage deductions in all pools, at all races, during all of the years involved. It is no less apparent that the bill is inadequate for relief of that amplitude. Let us for the moment concede the argument that express trusts were created by the bettors in each pool. Complainant does not tell us how many pools or "express trusts" there were. He alleges that he was a successful bettor in more than 250. But the total number of pools was many times this figure.[1] By complainant's own definition of beneficiaries as the successful bettors in any pool, he could not have been a beneficiary in more than about 250. As to the remaining "trusts", it does not appear that he stands in any relation other than that of a stranger. He suggests no theory, and none occurs to me, by which he

---

[1]There were three pools (win, place, and show) for each race during the four years. Assuming that there were six races a day and thirty racing days a year (compare 41 *Laws of Del.* pp. 682, 683), the total number of pools, separate "express trusts," would amount to 2160.

might have even a semblance of a right to enforce these "trusts." Indeed, the bill states no case whatever for any relief with respect to such "trusts."

Before discussing the 250 odd successful bets, it may be well to point out that under the pari-mutuel system of betting, defendant was under no duty or obligation to keep a record of the names or addresses of any bettors. As a necessary corollary, it owed no duty to seek out any of the successful bettors in order to pay them. When wagers are received by defendant, it issues tickets by an automatic vending machine which forms a part of the totalizator. *Delaware Steeplechase & Race Ass'n., v. Wise*, 2 *Terry* 587, 594, 27 *A.* 2d 357. After a race is run, it makes payment for successful bets upon presentation of the appropriate tickets.

Now, complainant's allegations about the 250 odd successful bets (with one exception) are vague in the extreme. He does not state the exact number. Nor the particular horses upon which he bet. Nor the amount he bet on any horse. Nor which of his bets were "win, place or show". He does not state the amount of breakage wrongfully deducted in any case, or even give an approximation of the total amount to which he claims to be entitled. Of course, defendant cannot be expected to know these matters, for it has no occasion to take note of any of them in conducting the pari-mutuel system. The only bet which complainant has attempted to describe is the one he made on "Maewhisk." The allegations as to the other bets fail utterly to define the essential terms of any "trust," to state the total number of "trusts" involved, or to convey any notion of the amount of liability sought to be enforced with respect to any or all of such "trusts."

Thus, even adopting complainant's trust theory, there is only one possible "trust" which need be considered further. Let us now proceed to examine whether the term

"express trust" is an appropriate juridical label for the aggregate of relations existing between complainant and defendant, as a result of complainant's $10 bet on "Maewhisk" to place, in the first race, on July 1, 1939. Complainant refers to broad, sweeping definitions of a trust, and of an express trust. A fair example is his quotation from the case *In re Vosburgh's Estate,* 279 *Pa.* 329, 123 *A.* 813, 815:

> "A trust is a relation between two persons, by virtue of which one of them as trustee holds property for the benefit of the other. The term 'trust' is a very broad and comprehensive one. Every deposit is a trust, except possibly general bank deposits; every person who receives money to be paid to another or to be applied to a particular purpose is a trustee, if so applied, as well as when not so applied."

Complainant then attempts to fit the betting transactions into the broad definitions. As a preliminary comment upon this approach, the following statement from 1 *Scott on Trusts,* § 2.3, *p.* 32, is apt:

> "Probably no legal term can be defined with perfect accuracy, so as to include all that is intended to be included and to exclude everything else. * * *

> "Even if it were possible to frame an exact definition of a legal concept, the definition would not be of great practical value. A definition cannot properly be used as though it were a major premise so that rules governing conduct can be deduced from it. Our law, at least, has not grown in that way. When the rules have been arrived at from other sources, it may be possible to attempt to frame a definition. But the definition results from the rules, and not the rules from the definition."

Manifestly, complainant's offered definitions, isolated from their contexts, appear to include many relationships which are classified in legal parlance specially and separately from the relationship denoted by the term "express trust." Complainant's argument at many points confuses constructive trusts with express trusts; and fails throughout to recognize the elementary distinction expressed in the introductory note to the *Restatement of the Law of Trusts,* as follows (1 *Restatement of Trusts, p.* 1):

"A trust is one of several juridical devices whereby one person is enabled to deal with property for the benefit of another person. Among other such devices are bailment, guardianship and agency. These latter devices are to be found in all mature systems of law; the trust is a peculiar product of the Anglo-American system."

Similarly, in 1 *Scott on Trusts*, § 2, *p.* 30, it is said:

"The term 'trust' is used by courts and lawyers in a variety of senses. It is sometimes used to include various fiduciary relationships, not only trust in the narrower sense, but also bailment, executorship, guardianship and agency. In the narrower sense the term is applied to that particular kind of a fiduciary relationship which owes its origin to the separation in England of courts of law and courts of equity, and which was evolved by the English Court of Chancery from the ancient use."

None of complainant's definition authorities involves situations arising out of the operation of the pari-mutuel system, or concerns betting under any system. Not one discusses the relation between a wagerer and a person performing functions even remotely similar to those of defendant. An inquiry naturally suggests itself: how have relationships more closely resembling the present been classified? *Chapter* 163 *of the Revised Code* (1935), relating to racing and the racing commission, contains no hint that licensed betting involves the creation of express trusts. The specific statute which is the ultimate source of defendant's authority to engage in its activities concerning betting, defines the authority in these words: "to make, conduct and sell pools by the use of pari mutuel machines or totalizators." *Rev. Code*, § 5510 and amendments. This language, particularly the word "sell," indicates that the legal relationship resulting from the exercise of the authority is one of contract, rather than of express trust.

In the previous litigation brought by complainant to recover the amount due him on a bet (*Wise v. Delaware Steeplechase & Race Ass'n., supra*), an action at law was chosen for this purpose. Complainant says that this is not

inconsistent with his present position, for reason that where a trustee is under a duty immediately and unconditionally to pay money to a beneficiary, the latter may maintain an action of debt or general assumpsit against the trustee to enforce payment. 1 *Restatement of Trusts,* § 198; 2 *Scott on Trusts,* § 198.1. However, one need only read the opinions to be convinced that such was not the theory urged in the earlier case. Discussing an argument of defendant before the Superior Court, that if its method of computing breakage was unwarranted, the plaintiff was suing on an illegal, and hence, unenforceable contract, the Chief Justice said (2 *Terry* 182, 192, 193, 18 *A. 2d* 419, 423) :

> "Whatever the defendant may have offered, and whatever the plaintiff may have tacitly accepted, with respect to the method of computing 'breakage', did not constitute the *contract*, for that was written into the *contract* by the force of the statute."

Again, in concluding the opinion, he said:

> "The *contract* between the parties was governed by the statute." (Italics supplied in both quotations.)

The case of *Attorney-General v. Luncheon and Sports Club, Limited, L. R.* 1929 A.C. 400, contains an elucidating analysis of the relations existing in a situation quite similar to the one at hand. The question before the court concerned the responsibility of the respondent Club as a "bookmaker" under the Finance Act of 1926. Betting on horse races was transacted on the Club premises through the use of totalizators. In making bets, club pool members handed over credit ,vouchers instead of cash. The Club charged a commission upon the gross amount of each pool, and distributed the remainder in cash, irrespective of any possible loss from failure to collect upon the vouchers. Lord Buckmaster said in his opinion (*pp.* 404-406) :

> "The relevant matters have now been stated and it remains to see how far they constitute a 'bet' between each member using the machinery of the pool and the respondents. This matter can best be

considered in the light of contract. The making of a bet is none the less the making of a contract, because it is by statute unenforceable and void. With whom then are these contracts made? The rules say they are made with the other members, and though, if that were a manifest cloak for the true transaction, no Court would be misled by mere colourable words but would seek the true bargain underneath, yet here I cannot see that the statement is at variance with the facts. * * * What is the contract each member makes with the respondents? It is nothing but this: in consideration of your providing me with the use of the machine, placing at my disposal the clerical assistance, undertaking to pay me if I win the money other members have promised me to pay and guaranteeing the amount, you shall have 10 per cent. of my stake. * * *

"I cannot find that there is anything to throw doubt on the accuracy of the statement that the respondents were distributing agents who guaranteed the honesty of all the people who use the machine and took 10 per cent. for their trouble and risk."

Discussing a contention that under the Club's by-laws there was effected on each race a series of bets between each participant and the Club, Lord Blanesburgh said (*p. 407*):

"These by-laws are not, as it seems to me, even evidence of a contract between each individual participant in a pool on the one side and the club on the other. They constitute rather a contract between the investing pool members on any race inter se, with a further contract between all these members collectively on the one hand with the 'management' or club on the other, whereby the club having provided facilities for its pool members to participate in pools constituted under the by-laws undertakes, for a consideration, the receipt of the subscriptions and the disposal of their net proceeds according to the event and in accordance with the rights and liabilities of the participants as thereby fixed."

It will be noted that those conducting the betting were characterized in the above case as "distributing agents." Other courts have said that such a person is "a custodian or depository of money staked, bet, or wagered" (*Pompano Horse Club v. State*, 93 *Fla.* 415, 111 *So.* 801, 812, 52 *A. L. R.* 51); that "he was merely registering the bets and acting as stakeholder for the bettors" (*McCall v. State*, 18 *Ariz.*

408, 161 *P.* 893, 896, *Ann. Cas.* 1918*A,* 168) ; that he is "but a stake holder of the money wagered to the extent that it is paid to the winners," and that the money is "held by the proprietor as a bailee or agent abiding the event of the betting contracts legalized by * * * Kentucky Statutes." *City of Louisville v. Churchill Downs,* 267 *Ky.* 339, 102 *S. W.* 2*d* 10, 13. I do not find a single case in which the one conducting betting under the pari-mutuel system is called, or dealt with as, a trustee of an express trust.

Neither the nature of the betting transaction nor the attendant circumstances justify treating it as the creation of an express trust. It cannot reasonably be said that by handing over $10 in making his wager, complainant reposed in defendant the extraordinary confidence and reliance which give rise to a fiduciary relationship of high order, and which are characteristic of an express trust. Complainant entered into the transaction simply to make a bet, to gamble, on a certain horse. Defendant, by accepting the money and issuing a ticket evidencing the wager, engaged to perform clerical functions with respect to this and other sums received; and to divide the pool (after deductions) in redemption of tickets which it issued, depending upon the result of the race. Complainant has failed to show wherein this undertaking was anything more than a contract. The substance of his claim is that defendant did not pay him the full amount called for by its undertaking. In such a case, an action at law for damages would seem an adequate remedy. *Delaware Steeplechase & Race Ass'n. v. Wise, supra.* For the reasons above set forth, no express trust was created.

Complainant has asserted no other ground of exclusive equitable jurisdiction. The only argument intimated for the exercise of the concurrent jurisdiction of equity is that this is a suit for the prevention of a multiplicity of actions at law. Even if we indulge in the unlikely assumption that

under this head of equitable cognizance, a person entitled to the amount payable upon a successful bet in a particular pool might properly sue in equity on behalf of himself and other such bettors in that or any other pool, on the ground of erroneous breakage deductions by defendant; the bill would, nevertheless, be insufficient. An obvious requisite of such a suit is that the bill contain allegations which, *prima facie,* show that complainant himself has an enforceable claim against defendant. The cursory mention of the 250 odd bets is wholly inadequate for this purpose. Once again our examination is narrowed to a consideration of the "Maewhisk" bet. Complainant alleges that he made this wager on July 1, 1939; that the horse finished the race successfully; and that "complainant thereupon presented his ticket to one of the cashiers at one of the windows of the defendant Association and was paid the sum of $18.50, accepting the money and surrendering his ticket." He later alleges that his "$10 ticket should have paid $18.85." This transaction antedated the institution of the present suit on December 22, 1943, by more than three years, the period of the statute of limitations applicable in an analogous case at law (an action for the recovery of money for breach of a simple contract). *Rev. Code,* § 5129.

Complainant contends, however, that the statutory period did not begin until a demand was made for the sum now claimed. He says that there has been no demand, except the filing of the bill of complaint. In this, he is palpably in error. Assuming a demand was necessary to initiate the running of the statute, the presentation of the ticket, as alleged in the bill, constituted a demand for the full sum properly payable upon the ticket, as effectually and as completely as would any verbal expression to that effect. It was then, at the latest, that his cause of action accrued.

Complainant also argues that the statutory period did not begin until the parties knew that defendant's method of

computing breakage was improper, and that this was first made known when the Supreme Court decided the question in the former case. The argument is without any merit.

Generally speaking, "where the statute bars the legal remedy, it shall bar the equitable remedy in an analogous case," in the absence of unusual circumstances, such as in a suit to undo a fraud, where persons in a fiduciary relation have enriched themselves by fraudulent breaches of duty. *Bovay v. H. M. Byllesby & Co.,* 27 *Del. Ch.* 381, 38 *A.* 2d 808. It need hardly be said that there are no such circumstances here. As found by the Supreme Court in *Delaware Steeplechase & Race Ass'n. v. Wise,* 2 *Terry* 587, 595, 27 *A.* 2d 357, in employing the erroneous method of computing breakage, defendant was following the universal custom for upwards of thirty years of those conducting the pari-mutuel system of betting in this country. In the language of the Superior Court: "The most that can be said is that there was an innocent misconception of the law." *Wise v. Delaware Steeplechase & Race Ass'n.,* 2 *Terry* 182, 193, 18 *A.* 2d 419, 423. That the method itself is devoid of iniquitous attributes is further evidenced by the fact that our General Assembly, by amendment of the racing laws of 1941, expressly authorized its application. 43 *Laws of Del., Chap.* 242, *p.* 1033.

It thus appears from the face of the bill that complainant's claim is barred by the statute of limitations. He has alleged no recoverable cause of action in himself against defendant. Several contentions advanced by defendant have not been considered, since, in any event, the demurrer must be sustained.

An order accordingly will be advised.

Note. Affirmed by the Supreme Court on appeal. See *post p.* 532, 45 *A.* 2d 547.