116 A.2d 711 (1955)
Elliot F. GLASSBERG, as Executor of the Last Will and Testament of Morris Glassberg, Deceased, Plaintiff,
v.
Howard BOYD, Lindsay Bradford, C. C. Cragin, A. R. Grambling, Paul Kayser, Frank Liddell, C. L. Perkins, H. F. Steen, D. H. Tucker, W. J. K. Vanston, Fred T. Wagner, Western Natural Gas Company and El Paso Natural Gas Company, Defendants.
Civ. No. 570.
Court of Chancery of Delaware, New Castle.
September 14, 1955.
*712 Robert C. Barab, Wilmington, and Milton Paulson, New York City, for plaintiff.
Killoran & Van Brunt and Berl, Potter & Anderson, Wilmington, Mudge, Stern, Baldwin & Todd, New York City, and Daniel Moody, Austin, Tex., for all defendants except Western Nat. Gas Co.
Morris, James, Hitchens & Williams, Wilmington, for defendant, Western Nat. Gas Co.
MARVEL, Vice Chancellor.
Plaintiff, who is a stockholder of El Paso Natural Gas Company as the California executor of the estate of Morris Glassberg, brings two actions of a derivative nature against the directors of El Paso, a Delaware corporation. The complaint seeks an accounting of profits claimed to have been made by the individual defendants at the expense of their corporation, for damages *713 sustained by the corporation as a result of alleged breaches of duty to the corporation on the part of the individual defendants, the enjoining of the performance of an allegedly void 1953 contract between the defendants, El Paso Natural Gas Company and Western Natural Gas Company, and a decree that an earlier contract of 1947 between the same corporate defendants purportedly amended by the 1953 contract remains in full force and effect. At argument, plaintiff's attorneys withdrew the prayer of the complaint which seeks rescission of the 1953 contract but contended vigorously that plaintiff is entitled to damages from the individual defendants for injuries allegedly suffered by El Paso because said defendants by accepting the 1953 contract changes, subjected El Paso to the burden of paying higher gas rates than those contained in the unexpired 1947 contract.
Prior to 1947 El Paso had for a number of years owned and operated a pipe line system in western Texas and southeastern New Mexico and had also owned and operated gas wells in the same general area, an oil and gas producing region known in the trade as the Permian Basin.
The first cause of action, which is divided into three parts, complains that in 1947 the defendants, Kayser, Liddell and Vanston, who at all times during the period the acts complained of took place never owned more than 3% of the stock of El Paso, through domination of the[1] board of that corporation, caused El Paso to extend its pipe line system to the California border from the San Juan Basin area of New Mexico and Colorado and also caused El Paso's wholly owned subsidiary, Western Gas Company, to acquire oil and gas interests in the same area with knowledge that the construction of the proposed pipe line would enhance the value of such properties. The complaint charges that these acts were carried out for the purpose of benefiting the named directors rather than El Paso and were consummated as part of a scheme which involved merging Western Gas Company with Gulf States Oil Company, a corporation in which the three named directors owned a 53% stock interest. As a result of the consummation of such merger a new corporation resulted known as Western Natural Gas Company, two thirds of the stock of which was issued to stockholders of Gulf States Oil Company and one third to El Paso. The stock distribution resulting from the merger made the three named defendants and their families substantial stockholders of the resulting Western Natural Gas Company.
El Paso, having received a certificate for such purpose from the Federal Power Commission in July 1950, proceeded to build a pipe line from the San Juan Basin to the California border, completing it in February 1952. As a result of the completion of the pipe line, oil properties owned by El Paso and Western Natural Gas Company in the San Juan Basin increased tremendously in value. Plaintiff charges that the above named individual directors in causing Western Natural Gas Company to acquire properties, which should have been acquired for El Paso, wrongfully diverted profits and earnings of the new pipe line from El Paso. While there is no answer to the first cause of action the director defendants in their briefs take the position that the merger of Western Gas Company and Gulf States Oil Company was actually accomplished for the purpose of protecting El Paso's stockholders from the penalties placed on the holding of production properties by the "rate base" approach to the determination of costs of production applied by the Federal Power Commission at the time the merger took place. It is also contended that the terms of the merger were worked out by independent appraisers and are fair and equitable.
It is also charged in the first cause of action that in September, 1950, these same directors wrongfully caused El Paso to pay *714 Western Natural Gas Company $552,898.80 for 13,000 acres of land in the San Juan Basin which had cost Western only $173,000.
Finally the first cause of action complains of the revision at El Paso's expense of a firm contract of 1947 under the terms of which Western was obligated to supply natural gas to El Paso. In May 1947, Western Natural Gas Company had contracted with El Paso to furnish gas from Western's wells in the Permian Basin at a stipulated price per thousand cubic feet. Plaintiff alleges that in July 1953 El Paso without any or adequate consideration furnished to it was caused by the directors, Kayser, Liddell and Vanston to increase substantially the price payable to Western for gas to the injury of the stockholders of El Paso.
For his second cause of action plaintiff charges that the individual defendants, notwithstanding the fact that many pipe line companies had challenged the constitutionality of a Texas law imposing a gas gathering tax, caused El Paso to pay without protest a total of $2,658,935 in such taxes to the State of Texas for the years 1951 through 1953. The Texas gas gathering statute was declared unconstitutional by the Supreme Court of the United States in February, 1954. Plaintiff charges the individual defendants with recklessness, negligence, improvidence and with responsibility for placing the corporate defendant in a position where not having paid the tax under protest for the years in question it may not be entitled to recover the amount paid in such taxes. If recovery is in fact made it appears that such recovery will be without interest.
The individual defendants have filed two motions to the first cause of action. They ask for summary judgment as to such cause of action insofar as it is based on modification of the 1947 gas contract between El Paso and Western Gas Company on the grounds that the Federal Power Commission has exclusive jurisdiction of plaintiff's claim by virtue of the Natural Gas Act and alternately for the reason that the modified contract is in all respects fair. Defendants also seek dismissal under Rule 12(b), Court of Chancery Rules, Del.C.Ann., of the entire first cause of action other than that part of it which is based on the amended contract of 1953 on the ground that the claims therein asserted are barred by the applicable Delaware statute of limitations.
Motions for summary judgment and for dismissal are also made to the second cause of action. The motion for summary judgment is based on the contention that the matters complained of in the second cause of action resulted from the exercise of honest business judgment on the part of El Paso's directors and accordingly are unassailable in a stockholder's suit. The motion to dismiss alleges that insofar as the second cause of action involves payment of taxes prior to February 1952, it is barred by the Delaware statute of limitations.
The heart of plaintiff's case contained in the first cause of action lies in his attack on the modification of the gas contract between El Paso and Western Natural Gas Company and this will be first considered. Joining issue on the defense of primary jurisdiction and conceding that the Federal Power Commission has the exclusive right to fix rates charged by independent gas producers, plaintiff contends nonetheless that because his suit seeks an accounting and damages for which there is no adequate adminstrative remedy under the Natural Gas Act, 15 U.S.C.A. § 717 et seq., he has nowhere to turn for relief but to a court of equity. He contends that his suit for an accounting and for damages is the traditional stockholder's derivative action and that the Federal Power Act, 16 U.S.C.A. § 791a et seq., does not and could not affect the right of a stockholder to sue for recoupment of past excessive rates wrongfully saddled on El Paso by its directors. Plaintiff argues that he does not seek to interfere with the conceded power of the Federal Power Commission to regulate independent gas producers, that he does not ask this Court to alter gas rates which have become "effective" under rules and regulations of the Federal Power Commission, but that what he seeks is an accounting and *715 damages from the individual defendants for causing El Paso unnecessarily to agree to increased rates for gas supplied to it by Western Natural Gas Company.
By agreement of May 1, 1947, Western Natural Gas Company granted El Paso the right to purchase a specified minimum quantity of gas produced by Western in the Permian Basin at fixed prices for a period of thirty years. On July 27, 1953, this contract was amended so as approximately to double the price required to be paid by El Paso for Western gas. The contract also increased the minimum quantities of gas which Western was obligated to furnish, at the new prices. Plaintiff charges that the contract change as to gas prices and other changes were forced on El Paso by its disloyal directors in order to benefit themselves and that El Paso received no consideration for such changes. Plaintiff contends that insofar as El Paso has paid Western Natural Gas Company for gas at the increased rates since July 27, 1953, El Paso has been caused to make a gift to Western.
The 1953 contract which is attached as exhibit G to the affidavit of the defendant, Kayser, provided that if the increased prices for gas fixed in the contract should not be considered a proper item of cost of gas to El Paso by the Federal Power Commission the new contract would be of no force and effect. By decision of the Federal Power Commission (Docket G-2018 attached as exhibit B to the Norwood affidavit) the increased price to be paid for gas by El Paso not only to Western but to numerous other suppliers was accepted as a proper item of cost to El Paso. As a result of such acceptance the increase in gas prices to be paid by El Paso was passed on and absorbed by those customers of El Paso willing to foot the bill. It is accordingly argued that not only have the stockholders of El Paso not been damaged but that they have been benefited because El Paso is a substantial stockholder of Western Natural Gas Company. In reply to this argument it is forcibly contended by plaintiff that the whole matter of increased payments by El Paso for gas supplied to it by Western was a surrender of valuable corporate contract rights by directors for their own selfish interests as stockholders of Western Natural Gas Company.
The duty of directors to place the interests of their corporation above their own is always a matter for concern on the part of this Court in a proper case and would be in the cause of action stated by plaintiff were this the usual stockholders' derivative action. This is not, however, the usual case because of the nature of the business of the corporate defendants and the Federal controls which govern the operation of a business admittedly subject to regulation by Congress.
In June 1954, in the case of Phillips Petroleum Co. v. State of Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, it was decided that the prices charged by independent producers for sale of natural gas in interstate commerce were subject to the control and jurisdiction of the Federal Power Commission. This decision closely followed the[2] adoption by the Federal Power Commission of a new theory for approving pipe line company costs, namely the "commodity" charge theory, which accepts as a rate component of the total cost-of-service charge to consumers, the fair price of gas in the field.
The rationale behind this revised rate-making policy of the Federal Power Commission as expressed in the Panhandle case is that the national interest as presently conceived by our planners is advanced by a policy which fixes prices for natural gas in the field and ultimately paid by the consumer sufficiently high to discourage wasteful consumption and high enough to encourage exploration for and exploitation of new sources of gas.
In the case of Montana-Dakota Utility Co. v. Northwestern Public Service Co., 341 U.S. 246, 71 S.Ct. 692, 695, 95 L.Ed. *716 912, the petitioner sought relief from allegedly unfair electric power contracts with respondent which it claimed had been saddled on it as a result of interlocking directorships and joint officers. In the District Court petitioner was successful. The contracts in question were found invalid for fraud, the rates and charges established therein declared void and petitioner was awarded damages. The Court of Appeals reversed on the ground that the District Court was without jurisdiction. While the Supreme Court held that there was power in the District Court to decide whether petitioner had properly stated a claim under the Federal Power Act, it sustained the judgment of the Court of Appeals and dismissed the complaint on the ground that Congress by the[3] Federal Power Act had empowered the Federal Power Commission to fix just and reasonable rates, having granted it the right to determine what is statutory reasonableness in a specific case. The Court stated:
"Petitioner cannot separate what Congress has joined together. It cannot litigate in a judicial forum its general right to a reasonable rate, ignoring the qualification that it shall be made specific only by exercise of the Commission's judgment, in which there is some considerable element of discretion. It can claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the Commission, and not even a court can authorize commerce in the commodity on other terms."
While petitioner's cause of action was brought under the Federal Power Act, the complaint charged the fraudulent use of interlocking directorships by respondent which allegedly controlled petitioner and prevented it from complaining to the Commission. The complaint also sought reparations for damages sustained as a result of respondent's fraud. The Supreme Court pointed out that while petitioner's case as a purely common law action was not maintainable in the Federal courts because of lack of diversity of citizenship it was maintainable under the Power Act if it stated a cause of action. The Court held, however, that the Federal Power Act vested in the Commission power to authorize an interlocking directorate, otherwise prohibited[4] "upon due showing * * * that neither public nor private interests will be adversely affected thereby."
The Court stated:
"* * * It would be a strange contradiction between judicial and administrative policies if a relationship which the Commission has declared will not adversely affect public or private interests were regarded by courts as enough to create a presumption of fraud. Perhaps, in the absence of the Commission's approval, such relationship would be sufficient to raise the presumption under state law, but it cannot do so where the federal supervising authority has expressly approved the arrangement."
The power of inquiry of the Federal Power Commission into rates is as broad under the Natural Gas Act as under the Federal Power Act.[5] In short the powers vested in the Federal Power Commission to inquire into subsidiary and affiliate relationships, the[6] objections of stockholders intervening in a rate case and all other factors which might shed light on the overall reasonableness of rates leave no room for independent court action concerning established rates.
The effect of the decision of the Supreme Court in Montana-Dakota Utilities *717 Co. v. Northwestern Public Service Co., supra, is to foreclose further inquiry into gas rates once such rates have become effective pursuant to Federal Power Commission procedure. Regardless of what words are used to characterize the nature of plaintiff's derivative claim for alleged damages caused to El Paso as a result of revision of the 1947 gas contract between El Paso and Western, plaintiff here seeks an inquiry into the fixing of gas rates, a matter which Congress has placed under the jurisdiction of the Federal Power Commission. Furthermore, as I read the majority opinion of the Supreme Court in the Montana-Dakota case, the Court having decided that Congress intended that neither the Federal Power Commission nor the courts should have power to grant reparations, there is no residual jurisdiction remaining for independent court action in this type of action whether based on fraud under the Natural Gas Act or on common law fraud at least where the fraud charged is presumed from interlocking intercorporate relationships. See Natural Gas Pipeline Co. v. Slattery, 302 U.S. 300, 58 S.Ct. 199, 82 L.Ed. 276; McClellan v. Montana-Dakota Utilities Co., D.C.D.Minn., 104 F. Supp. 46, affirmed 8 Cir., 204 F.2d 166, and footnote No. 5 above.
Summary judgment for the director defendants dismissing plaintiff's first cause of action insofar as it seeks an accounting and damages arising out of the 1953 revision of the contract between the corporate defendants will be entered for failure to state a cause of action cognizable in this Court.
The actual conspiracy which forms the basis of the first cause of action and all of the overt acts other than the contract modification of 1953 charged against the individual defendants occurred more than three years before this suit was filed. Inasmuch as the well pleaded allegations of the complaint disclose that all of the overt acts of the civil conspiracy therein charged other than the 1953 contract modification are barred by the three year Delaware statute, such defense which was formerly raised by demurrer, Cochran v. F. H. Smith, 20 Del.Ch. 159, 174 A. 119, may now be made by a motion to dismiss, Henis v. Compania Agricola De Guatemala, D.C.Del., 116 F.Supp. 223, affirmed 3 Cir., 210 F.2d 950, Park In Theatres v. Paramount Richards Theatres, D.C.Del, 90 F.Supp. 727, affirmed 3 Cir., 185 F.2d 407. Furthermore the last two cited cases are authority for the principle that the applicable statute of limitations in a civil conspiracy runs from the time of the overt act which is alleged to have caused the damages complained of even though damages continue to flow indefinitely as a result of such act. Otherwise, there would be no bar of the statute so long as a conspiracy continues.
The question remains, however, does the Delaware three year statute, § 8106, Title 10, Del.C., which is applicable to a civil conspiracy apply so as to bar alleged overt acts of the individual defendants occurring before February 1952? First of all I am satisfied that this type of case which is essentially one for damages is one where the applicable statute at law acts as a strict bar in equity if the suit has in fact been brought too late, Perkins v. Cartmell, 4 Harr. 270, Wise v. Delaware Steeplechase & Race Ass'n, 28 Del.Ch. 161, 39 A.2d 212; 28 Del.Ch. 532, 45 A.2d 547, 165 A.L.R. 830, and there is no allegation of fraudulent concealment of the actions allegedly taken by the defendant directors during the period from August 1947, when the essence of the so-called conspiracy was made public, to February, 1952 which would prevent the statute from running.
There remains for decision, however, the effect of § 8116 of Title 10 Del. C. which excludes from computation in fixing the period of the statute of limitations the time between the accrual of a cause of action and the time when a defendant comes into Delaware "* * * in such manner that by reasonable diligence, he may be served with process." While certain of the individual defendants have on occasion been in Delaware for corporate meetings during recent years, these visits *718 have been brief and sporadic. The effect, if any, of these visits on the running of the statute of limitations need not in my opinion be considered as I am convinced that the first cause of action insofar as it is concerned with actions taken by the individual defendants prior to February 1952 is barred by reason of the provision of § 8120 of Title 10, Del.C. which limits the time for the bringing an out of state action by a non-resident to whichever is shorter, the time fixed by the law where the cause arose or the law of Delaware. This section also provides that where the cause of action originally accrued in favor of a person who at the time of such accrual was a resident of Delaware the time limited by the law of this State shall apply.
There is no question but that the first cause of action arose outside of Delaware, and that except for the possibility of service of process on certain of the directors while in attendance at corporate meetings in the State, the only means of bringing the individual defendants into a Delaware court has been by compelling their appearance through seizure of their property in Delaware as has been done in the case at bar.
If § 8116 is to be read into § 8120 and the principle of[7] Wells v. Jones, Err. & App., 2 Houst. 329, applicable, the bar of the statute might never run against non-resident directors of a Delaware corporation even though the corporation itself is at all times subject to service of process. It is my opinion that § 8120, enacted in 1947, not as an amendment to an earlier act, and in which no reference is made to a preexisting savings clause, was intended to protect the courts of Delaware from the necessity of adjudicating stale out of state claims through the creation of a statutory limitation against foreign causes of action barred by either the appropriate Delaware statute of limitations or in the case of a non-resident plaintiff any applicable shorter statute in force where the cause accrued.
To read the savings clause of § 8116 into § 8120 would stultify the effect of § 8120 on a case such as this. The Legislature having enacted legislation on a specific subject, namely out of state actions, without any reference to the absence of a defendant from the state must have intended to exclude the general savings provision of the earlier statute, Lewis v. Pawnee Bill's Wild West Co., 5 Pa. 397, 61 A. 868. An out of state exception for a foreign cause of action definitely will not be read into the Delaware statute of limitations, White v. Govatos, 1 Terry 349, 10 A.2d 524. Furthermore the re-enactment of present § 8116 and § 8120 into the 1953 Delaware Code did not have the effect of destroying the historical background and original force of present § 8120, Nigro v. Flinn, 8 W.W.Harr. 363, 192 A. 685. See also § 104(b) of Title 1 Del.C. which specifically preserves a defendant's right to rely on the limitation fixed by chap. 254 of 46 Laws of Delaware (present § 8120 of Title 10, Del. C.) as to acts charged against him prior to the adoption of the Delaware Code of 1953.
Having held that the three year period fixed by the Delaware statute, unaffected by any savings clause, is the longest time within which plaintiff's first cause of action, as it concerns acts prior to February 2, 1952, could have been brought in Delaware, such cause of action will be dismissed as to such acts.
There remains for consideration the motions and answer to plaintiff's second cause of action. These defenses raise the bar of the statute of limitation and assert that the actions of the directors in causing El Paso to pay $2,658,935 in taxes to the State of Texas under a law subsequently declared unconstitutional by the Supreme Court of the United States were an exercise of honest business judgment.
The motion to dismiss is granted insofar as the complaint seeks damages for the *719 actions of the individual directors in causing the taxes to be paid prior to February 1952 for the reasons stated earlier in this opinion in connection with dismissal of that part of the first cause of action which occurred prior to the same date. The three years permitted by the Delaware statute is the maximum period permitted under § 8120 of Title 10 Del.C. for the bringing of a tort action arising out of the State.
In defense to plaintiff's claim for damages as a result of payment of gas gathering taxes to the State of Texas after February 1952, the individual defendants contend that as a matter of law they are entitled to summary judgment inasmuch as plaintiff does not charge fraud or overreaching in connection with payment of the taxes in question and there is accordingly no actionable issue as to the payment of such taxes. Plaintiff contends that payment of the taxes was a result of negligence, carelessness and improvidence on the part of the directors. There is no intimation, however, that the individual defendants profited as a result of the tax payment. Moreover, defendants' affidavits clearly disclose why the taxes in question were paid.
There is no genuine dispute about the material facts. The taxes could have been paid under protest and readily recovered after the decision of the Supreme Court in Michigan-Wisconsin Pipeline Co. v. Calvert, 347 U.S. 157, 74 S.Ct. 396, 98 L. Ed. 583, which declared the tax gathering statute unconstitutional. The individual defendants on advice of counsel had honest doubts that there was any constitutional flaw in the statute, and these doubts were temporarily vindicated when the appellate courts of Texas upheld the law after it had been declared unconstitutional in the trial court. The directors were also advised by El Paso's general counsel that in his opinion the tax protest statute was not exclusive but cumulative to other rights and remedies, and that a failure to protest did not preclude recovery of the amount voluntarily paid in a suit to the filing of which the State of Texas might be expected to consent. Defendant directors did not voluntarily cause the tax to be paid until they had carefully weighed the advice of counsel and given full consideration to the effect of protest on Texas authorities. The tax had become law as a result of strong public opinion directed at some means of forcing the pipe line companies to compensate the state for the loss of large quantities of natural wealth being extracted for export from Texas soil in the form of natural gas. During the period that the tax was in force, El Paso was engaged in a large construction program in Texas which necessitated obtaining easements in order to carry out such program. It was thought unwise by the El Paso directors to jeopardize this building program by incurring the ire of Texas bureaucrats. Furthermore, they felt that opposition to the tax might result in a more onerous type of revenue measure aimed at the pipe line companies. The directors also reasonably believed that if they paid the tax under protest and the Federal Power Commission disallowed such payments as a cost-of-service item in El Paso's pending rate increase application, the corporation would then be faced with the necessity of applying for another rate increase if the validity of the tax were to be ultimately upheld. They also felt reasonably sure that the Federal Power Commission would accept the tax payments as a corporate cost inasmuch as the tax was a valid law at the time the rate application was made. Actually two members of the Commission in the rate case, which was decided after the Supreme Court declared the gas tax unconstitutional, ruled that the tax payments should be allowed as an operating cost to El Paso inasmuch as the taxes had been paid as a result of the exercise of business discretion.
Had plaintiff sufficiently charged fraud or lack of good faith, there would undoubtedly be factual matters for the Court to decide, Gottlieb v. Heyden Chemical Corporation (Sup.Ct.Del.) 90 A.2d 660, 91 A.2d 57, but the record as presently constituted contains nothing which casts any doubt on the presumption that directors act in good faith. *720 Had plaintiff any suspicion that the defendant directors caused the tax to be paid other than in the exercise of their honest business judgment, there has been ample opportunity for pre-trial discovery to search out fraud. Defendants' affidavits are explicit and understandable and the Court cannot substitute its judgment for that of corporate directors as to the wisdom or desirability of causing the taxes to be paid without protest.
In the case of Barrett v. Denver Tramway Corporation, D.C.Del., 53 F.Supp. 198, Judge Leahy defines that type of director disregard of the rights of stockholders sufficient to result in successful stockholder action against directors as "constructive fraud", "bad faith" or "gross unfairness". In the case of Perrott v. United States Banking Corporation, D.C.Del., 53 F.Supp. 953, Judge Leahy sustained a motion to strike allegations of the complaint charging a director with profiting personally from selling the corporate defendant's securities through a controlled corporation, there being no charge that such profits were excessive or fraudulent. The Court refused to substitute its judgment for that of other directors who had determined that the profit taken by the named director was reasonable and legitimate.
There are no real issues of fact as to the alleged negligence and improvidence of the defendant directors. What is before the Court on the second cause of action is actually a question of law determinable from facts which are not in dispute. There is no question but that the taxes were paid to the proper Texas tax authorities, and there is no intimation of any act of self-seeking fraud, bad faith or gross unfairness on the part of the individual defendants. At the most a non-actionable mistake or error of judgment has been charged, 3 Fletcher, Cyclopedia Corporations (Perm. Ed.) § 1039 p. 570.
There being no genuine factual issue as to the matter of the tax payments and the Court having found as a matter of law that the directors exercised honest business judgment in such matter, summary judgment for the individual defendants as to plaintiff's entire second cause of action will be entered.
Order on Notice.
NOTES
[1] The complaint charges that the other individual defendants are in one way or another beholden to the defendants, Kayser, Liddell and Vanston and accordingly are incapable of exercising individual unbiased judgment as corporate directors.
[2] In the Matter of Panhandle Eastern Pipe Line Co., F.P.C. Op. No. 269, April 15, 1954, C.C.H. Utilities Law Reporter par. No. 9,405, page 11,056.
[3] 16 U.S.C.A. § 791a et seq.
[4] 16 U.S.C.A. § 825d.
[5] § 8(c), Natural Gas Act, 15 U.S.C.A. § 717g; subchapter E Parts 154 and 157, Rules and Regulations, Federal Power Commission; Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333.
[6] Part I, Rules of Procedure of the Federal Power Commission at § 1.8 (C.C.H. Utilities Law Reporter par. 3166, page 4099).
[7] In this case the Court of Errors and Appeals of Delaware declined to deny the benefit of the savings clause to an out of state defendant merely because he had property in the State subject to seizure.