# MICHIGAN-WISCONSIN PIPE LINE CO. *v.* CALVERT, COMPTROLLER OF PUBLIC ACCOUNTS, ET AL.

NO. 198.

Argued January 5–6, 1954.—Decided February 8, 1954.

*D. H. Culton* and *S. A. L. Morgan* argued the cause for appellants. On the brief were *Arthur R. Seder, Jr., Everett L. Looney, R. Dean Moorhead, Mr. Culton* and *Mr. Morgan* for the Michigan-Wisconsin Pipe Line Company, and *E. H. Lange, Gene M. Woodfin, Chas. I. Francis, Mr. Looney, Mr. Moorhead* and *Mr. Culton* for the Panhandle Eastern Pipe Line Company, appellants.

*John S. L. Yost* entered an appearance for appellant in Nos. 200 and 201.

*W. V. Geppert,* Assistant Attorney General of Texas, and *John Ben Shepperd,* Attorney General, argued the cause for appellees. With them on the brief was *William W. Guild,* Assistant Attorney General.

Mr. Justice Clark delivered the opinion of the Court.

The appellants, two natural gas pipeline companies, brought separate suits against Texas State officials, appellees here, in a state district court, seeking a determination that a Texas tax statute as applied to appellants violates the Commerce Clause of the Constitution of the United States, and seeking recovery of money paid under protest in compliance with the statute. The District Court sustained appellants' contentions and entered judgment in their favor. The Court of Civil Appeals reversed, holding that the tax statute as applied is constitutional. 255 S. W. 2d 535. The Supreme Court of Texas "refused" appellants' applications for writs of error.

By state statute and procedural rule, the docket notation "refused" in denying application for writ of error signifies that the State Supreme Court deems the judgment of the Court of Civil Appeals a correct one and the principles of law declared in the opinion correctly determined. Appellants were uncertain whether appeal to this Court was properly from the Court of Civil Appeals or the Supreme Court of Texas, as "the highest court of a State in which a decision could be had" within the meaning of 28 U. S. C. § 1257. Hence each appellant appealed from each of the courts.[1] We postponed to the hearing of the cases on the merits a determination of the jurisdictional question. 346 U. S. 805.

---

[1] Cf. *Western Union Telegraph Co.* v. *Priester,* 276 U. S. 252 (1928).

We think that appeals in these cases were properly from the Court of Civil Appeals. In *American Railway Express Co.* v. *Levee,* 263 U. S. 19 (1923), the Supreme Court of Louisiana had refused a writ of certiorari to the State Court of Appeal "for the reason that the judgment is correct." Mr. Justice Holmes, speaking for a unanimous Court, said:

> ". . . [U]nder the Constitution of the State the jurisdiction of the Supreme Court is discretionary . . . and although it was necessary for the petitioner to invoke that jurisdiction in order to make it certain that the case could go no farther, . . . when the jurisdiction was declined the Court of Appeal was shown to be the highest Court of the State in which a decision could be had. Another section of the article cited required the Supreme Court to give its reasons for refusing the writ, and therefore the fact that the reason happened to be an opinion upon the merits rather than some more technical consideration, did not take from the refusal its ostensible character of declining jurisdiction. *Western Union Telegraph Co.* v. *Crovo,* 220 U. S. 364, 366. *Norfolk & Suburban Turnpike Co.* v. *Virginia,* 225 U. S. 264, 269. Of course the limit of time for applying to this Court was from the date when the writ of certiorari was refused." 263 U. S., at 20–21.

In *Lone Star Gas Co.* v. *Texas,* 304 U. S. 224 (1938), with the present Texas procedural provisions in effect, this Court's mandate issued to the Court of Civil Appeals in a case where the State Supreme Court had "refused" writ of error. See also *United Public Service Co.* v. *Texas,* 301 U. S. 667 (1937).

Accordingly the appeals in Nos. 199 and 201, from the Supreme Court of Texas, are dismissed. We proceed to consider Nos. 198 and 200.

The question presented is whether the Commerce Clause is infringed by a Texas tax on the occupation of "gathering gas," measured by the entire volume of gas "taken," as applied to an interstate natural gas pipeline company, where the taxable incidence is the taking of gas from the outlet of an independent gasoline plant within the State for the purpose of immediate interstate transmission. In relevant part the tax statute [2] provides that "In addition to all other licenses and taxes levied and assessed in the State of Texas, there is hereby levied upon every person engaged in gathering gas produced in this State, an occupation tax for the privilege of engaging in such business, at the rate of 9/20 of one cent per thousand (1,000) cubic feet of gas gathered." Using a beggared definition of the term "gathering gas," the Act further provides that "In the case of gas containing gasoline or liquid hydrocarbons that are removed or extracted at a plant within the State by scrubbing, absorption, compression or any other process, the term 'gathering gas' means the first taking or the first retaining of possession of such gas for other processing or transmission whether through a pipeline, either common carrier or private, or otherwise after such gas has passed through the outlet of such plant." It also prohibits the "gatherer" as therein defined from shifting the burden of the tax to the producer of the gas, and provides that the tax shall not be levied as to gas gathered for local consumption if declared unconstitutional as to that gathered for interstate transmission.

Michigan-Wisconsin Pipe Line Company and Panhandle Eastern Pipe Line Company, appellants, are Delaware corporations and are natural gas companies holding certificates of convenience and necessity under the Natural Gas Act of 1938 for the transportation and sale

---

[2] Tex. Laws 1951, c. 402, § XXIII.

in interstate commerce of natural gas. The nature of their activities has been stipulated.

Michigan-Wisconsin has constructed a pipeline extending from Texas to Michigan and Wisconsin. At points in these two States and in Missouri and Iowa it sells gas to distribution companies which serve markets in those areas.[3] It sells no gas in Texas. The company produces no gas; it purchases its supply from Phillips Petroleum Company in Texas, under a long-term contract. Phillips collects the gas from the wells and pipes it to a gasoline plant, where certain liquefiable hydrocarbons, oxygen, sulphur, hydrogen sulphide, dust and foreign substances are removed preparatory to the transmission of the residue. As this residue gas leaves the absorbers, it flows through pipes owned by Phillips for a distance of 300 yards to the outlet of its gasoline plant, at the boundary between property of Phillips and property of Michigan-Wisconsin. Phillips has installed gas meters in its pipes at this point. The gas emerging from the outlet flows directly into two 26-inch pipelines of

---

[3] The two appellants, through the distribution companies, supply gas for consumer markets with a population of about 12,000,000 people. As noted by the court below, "Except for minor variations Panhandle conducts its activities in the same manner as Michigan-Wisconsin. Panhandle loads its interstate pipeline with gas from the outlets of three gasoline plants, rather than with gas from only one plant; it produces a portion of the gas which it takes at the outlet of one of such plants; and it makes sales in Texas to three small customers, rather than sending all of its gas outside the State." We agree with that court that for purposes of this decision Panhandle's operations are not significantly different from those of Michigan-Wisconsin. Only the interstate aspects of the enterprise are in question. The operations of Michigan-Wisconsin, which transmits all of its gas out of Texas, most clearly present the question to be decided and will be the basis of our discussion. This approach was utilized by the State court; and appellees do not suggest that the situations of the two appellants are different for purposes of decision here.

Michigan-Wisconsin. It is this "taking" that is made the taxable incidence of the statute. After the gas has been taken into the Michigan-Wisconsin pipes, it flows a distance of approximately 1,215 feet to a compressor station owned and operated by Michigan-Wisconsin, at which station the pressure of the gas is raised from about 200 pounds to some 975 pounds to facilitate movement to distant markets. In the course of its flow through this station the gas is compressed, cooled, scrubbed and dehydrated and then passes into a 24-inch pipeline which carries it 1.74 miles to the Oklahoma border and thence to markets outside Texas. Additional motive power is furnished by 15 other compressor stations in other states through which the gas is transported.

The entire movement of the gas, from producing wells through the Phillips gasoline plant and into the Michigan-Wisconsin pipeline to consumers outside Texas, is a steady and continuous flow. All of Michigan-Wisconsin's gas is purchased from Phillips for transportation to points outside Texas, and is in fact so transported.

Exclusive of the tax in question, Michigan-Wisconsin pays an ad valorem tax on the value of all its facilities and leases within the State. The State also levies on producers a tax of 5.72% of the value at the well of all gas produced in the State and a special tax to cover expenses in enforcing the conservation and proration laws.

The appellees place much emphasis upon the fact that Texas through these conservation and proration measures has afforded great benefits and protection to pipeline companies. It is beyond question that the enforcement of these laws has been not only in the public interest but to the commercial advantage of the industry. But, though this be an appealing truth, these benefits are relevant here only to show that essential requirements of due process have been met sufficiently to justify the

imposition of *any* tax on the interstate activity. No challenge is made of the validity of the tax under the Due Process Clause, the appellants basing their objections only on the Commerce Clause, and when we proceed to examine the tax under the latter its validity "depends upon other considerations of constitutional policy having reference to the substantial effects, actual or potential, of the particular tax in suppressing or burdening unduly the commerce." *Nippert* v. *Richmond*, 327 U. S. 416, 424 (1946). We proceed, therefore, to discuss only those relevant factors involved in the testing of the tax under the Commerce Clause.

The tax here assailed applies equally to gas moving in intrastate and interstate commerce. It is levied in addition to all other licenses and taxes and is denominated an occupation tax for the privilege of engaging in the "gathering of gas." Obviously appellants are not engaged in "gathering gas" within the meaning of that term in its ordinary usage; but the tax statute gives the term a transcendent scope; as to appellants' operations it is defined as "the first taking . . . of possession of such gas for other processing or transmission . . . after such gas has passed through the outlet" of a gasoline plant. The State Appellate Court realistically found "the taxable event described by the statute" to be "the taking or retaining of the gas at the gasoline plant outlet . . . ." It thought that since this local activity was not subject to repetition elsewhere, "the sole question is whether such local activities are so closely related to and such an integral part of the interstate business of [appellants] who transport gas in interstate commerce as to be within the scope of the Commerce Clause of the Constitution." The court concluded that such taking "is just as local in nature as the production itself is local," and held the tax valid principally on the authority of *Utah Power & Light Co.*

v. *Pfost,* 286 U. S. 165 (1932), and *Hope Natural Gas Co.* v. *Hall,* 274 U. S. 284 (1927).[4]

We accept the State court's determination of the operating incidence of the tax, and we think the court has correctly stated the essential question presented. But we are unable to agree with its answer thereto or with its conclusion of constitutionality.

Appellants' business is the interstate transportation and sale of natural gas. Under the Commerce Clause interstate commerce and its instrumentalities are not totally immune from state taxation, absent action by Congress. Frequently it has been said that interstate business must pay its way, *Postal Telegraph-Cable Co.* v. *Richmond,* 249 U. S. 252, 259 (1919); *Western Live Stock* v. *Bureau of*

---

[4] Appellees challenge at the outset of their argument this Court's jurisdiction to consider these appeals, on the ground that appellants present no question, federal or otherwise, for the Court's determination. The argument is in substance that appellants' grounds of protest in the State courts set forth a number of alleged operating incidences of the tax, none of which coincided with the operating incidence found by the Court of Civil Appeals; that the State court's finding on this subject is conclusive and binding on this Court; that appellants, in urging that the tax is a burden on and discriminatory against interstate commerce, are advancing new grounds not considered by the State courts and hence waived under the Texas protest statute; in short, that the issue of the validity of the tax was not properly raised. We think there is no substance to this contention. In their complaints and continuously thereafter appellants specifically challenged the validity of the tax statute under the Commerce Clause. The trial court held the tax invalid as violating the Commerce Clause. The Court of Civil Appeals expressly stated that the question for its decision was whether the statute as applied to appellants "violates the commerce clause of the Constitution of the United States. If so it is void, if not it is valid." Since the State courts have clearly treated the single issue here presented as properly raised and preserved, and since appellees first suggested the contrary in their brief on argument in this Court, we think the objections to jurisdiction are not well taken.

*Revenue,* 303 U. S. 250, 254 (1938); and the Court has done more than pay lip service to this idea. Numerous cases have upheld state levies where it is thought that the tax does not operate to discriminate against commerce or unduly burden it either directly or by the possibility of multiple taxation resulting from other taxes of the same sort being imposed by other states. The recurring problem is to resolve a conflict between the Constitution's mandate that trade between the states be permitted to flow freely without unnecessary obstruction from any source, and the state's rightful desire to require that interstate business bear its proper share of the costs of local government in return for benefits received. Some have thought that the wisest course would be for this Court to uphold all state taxes not patently discriminatory, and wait for Congress to adjust conflicts when and as it wished. But this view has not prevailed, and the Court has therefore been forced to decide in many varied factual situations whether the application of a given state tax to a given aspect of interstate activity violates the Commerce Clause. It is now well settled that a tax imposed on a local activity related to interstate commerce is valid if, and only if, the local activity is not such an integral part of the interstate process, the flow of commerce, that it cannot realistically be separated from it. *Memphis Natural Gas Co.* v. *Stone,* 335 U. S. 80, 87 (1948); *Western Live Stock* v. *Bureau of Revenue, supra,* at 258. And if a genuine separation of the taxed local activity from the interstate process is impossible, it is more likely that other states through which the commerce passes or into which it flows can with equal right impose a similar levy on the goods, with the net effect of prejudicing or unduly burdening commerce.

The problem in this case is not whether the State could tax the actual gathering of all gas whether transmitted in interstate commerce or not, cf. *Hope Natural Gas Co.* v.

*Hall, supra,* but whether here the State has delayed the incidence of the tax beyond the step where production and processing have ceased and transmission in interstate commerce has begun. Cf. *Utah Power & Light Co.* v. *Pfost, supra.* The incidence of the tax here at issue, as stated by the Texas appellate court, is appellants' "taking" of gas from Phillips' gasoline plant. This event, as stipulated, occurs after the gas has been produced, gathered and processed by others than appellants. The "taking" into appellants' pipelines is solely for interstate transmission and the gas at that time is not only actually committed to but is moving in interstate commerce. What Texas seeks to tax is, therefore, more than merely the loading of an interstate carrier, which was condemned in *Joseph* v. *Carter & Weekes Stevedoring Co.,* 330 U. S. 422, 427 (1947), for the gas here simultaneously enters the pipeline carrier and moves on continuously to its outside market. "There is no break, no period of deliberation, but a steady flow ending as contemplated from the beginning beyond the state line." *United Fuel Gas Co.* v. *Hallanan,* 257 U. S. 277, 281 (1921). As early as *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196, 213 (1885), this Court said, "Receiving and landing passengers and freight is incident to their transportation." But receipt of the gas in the pipeline is more than its "taking"; from a practical standpoint it is its "taking off" in appellants' carrier into commerce; in reality the tax is, therefore, on the exit of the gas from the State. This economic process is inherently unsusceptible of division into a distinct local activity capable of forming the basis for the tax here imposed, on the one hand, and a separate movement in commerce, on the other. It is difficult to conceive of a factual situation where the incidence of taking or loading for transmission is more closely related to the transmission itself. This Court has held that much less integrated activity is "so closely related to interstate

transportation as to be practically a part of it." [5] We are therefore of the opinion that the taking of the gas here is essentially a part of interstate commerce itself.

The Court of Civil Appeals, as we have stated, relied largely on *Utah Power & Light Co.* v. *Pfost, supra.* But that case involved a license tax on the generation of electricity produced in a hydraulic power plant within the State of Idaho and transmitted to Utah. The question the Court was called upon to solve was whether "the generation of electrical energy, like manufacture or production generally, [is] a process essentially local in character and complete in itself; or is it so linked with the transmission as to make it an inseparable part of a transaction in interstate commerce?" The Court thought it inaccurate to say that the entire system was purely a transferring device. "On the contrary," it said, "the generator and the transmission lines perform different functions, with a result comparable, so far as the question here under consideration is concerned, to the manufacture of physical articles of trade and their subsequent shipment and transportation in commerce." [6] Cited to support this principle was *Oliver Iron Mining Co.* v. *Lord,* 262 U. S.

[5] *Baltimore & Ohio S. W. R. Co.* v. *Burtch,* 263 U. S. 540, 544 (1924) ("loading or unloading of a shipment"); also see *Telegraph Co.* v. *Texas,* 105 U. S. 460, 466 (1882) (tax on "sending" of messages outside state is a regulation of interstate commerce); *Puget Sound Stevedoring Co.* v. *State Tax Commission,* 302 U. S. 90, 92 (1937) ("loading and discharge of cargoes" is interstate operation); *Richfield Oil Corp.* v. *State Board,* 329 U. S. 69, 83 (1946) (commerce begins "no later than the delivery of the oil into the vessel").

[6] 286 U. S., at 180–181. The Court found that in the operation there involved it was necessary to convert the mechanical energy into electrical energy before it could be transmitted and that this transformation was completed at the generator where the interstate movement began. This is analogous to the situation here where the gas is prepared by Phillips for transmission and is then fed into appellants' lines.

172 (1923), where a state tax levied on all "engaged in the business of mining or producing iron ore or other ores" was upheld since the "ore does not enter interstate commerce until after the mining is done, and the tax is imposed only in respect of the mining" (at 179); and *Hope Natural Gas Co.* v. *Hall, supra,* which upheld a tax on "producers of natural gas reckoned according to the value of that commodity at the well." But the tax here is not levied on the capture or production of the gas, but rather on its taking into interstate commerce *after* production, gathering and processing.

The State Appellate Court recognized that nothing was done to the gas at the point of "taking"; its form was not changed in any way; it merely continued its journey. However, the court thought that it would be unfair to base a decision on the fluid nature of natural gas, and that there was in fact a two-step process, taking and transmission, with interference in between found in title passing and processing. But the processing, on which this tax is *not* imposed, was done by Phillips and took place prior to the taxable event of "taking." As for the interference of title passing, appellees readily admit this levy was designed to avoid taxing the sale; and we think that, as a basis for finding a separate local activity, the incidence must be a more substantial economic factor than the movement of the gas from a local outlet of one owner into the connecting interstate pipeline of another. Such an aspect of interstate transportation cannot be "carve[d] out from what is an entire or integral economic process," *Nippert* v. *Richmond, supra,* at 423, by legislative whimsy and segregated as a basis for the tax. The separation must be realistic.[7]

_____

[7] Appellees also rely on *Memphis Natural Gas Co.* v. *Stone, supra; Western Live Stock* v. *Bureau of Revenue, supra; Edelman* v. *Boeing Air Transport,* 289 U. S. 249 (1933); *Chassaniol* v. *Greenwood,* 291 U. S. 584 (1934); *Coverdale* v. *Arkansas-Louisiana Pipe Line Co.,* 303

Here it is perhaps sufficient that the privilege taxed, namely the taking of the gas, is not so separate and distinct from interstate transportation as to support the tax. But additional objection is present if the tax be upheld. It would "permit a multiple burden upon that commerce," *Joseph* v. *Carter & Weekes Stevedoring Co.,* *supra,* at 429, for if Texas may impose this "first taking" tax measured by the total volume of gas so taken, then Michigan and the other recipient states have at least equal right to tax the first taking or "unloading" from the pipeline of the same gas when it arrives for distribution. Oklahoma might then seek to tax the first taking of the gas as it crossed into that State. The net effect would be substantially to resurrect the customs barriers which the Commerce Clause was designed to eliminate. "The very purpose of the Commerce Clause was to create an area of free trade among the several States. That clause vested the power of taxing a transaction forming an unbroken process of interstate commerce in the Congress, not in the States." *McLeod* v. *Dilworth Co.,* 322 U. S. 327, 330–331 (1944).

*Reversed.*

---

U. S. 604 (1938). We think these cases are distinguishable from the present one in that in each of them the tax was imposed on a less integral part of the commerce process involved. Also distinguishable is *McGoldrick* v. *Berwind-White Coal Mining Co.,* 309 U. S. 33 (1940), involving a tax on the sale of goods for consumption, imposed by the city in which the goods had come to rest. The Court there found that commerce, as to the goods, had ended prior to the taxable event, and likened the tax to an ad valorem one on property.