THE ARCTIC MAID and Arctic Maid Fisheries, Inc., Appellants,

v.

TERRITORY OF ALASKA, Appellee.

THE PACIFIC REEFER and Pacific Reefer Fisheries, Appellants,

v.

TERRITORY OF ALASKA, Appellee.

THE PACIFIC QUEEN and Pacific Queen Fisheries, Appellants,

v.

TERRITORY OF ALASKA, Appellee.

THE ALASKA REEFER and Alaska Reefer Fisheries, Appellants,

v.

TERRITORY OF ALASKA, Appellee.

THE NORTH STAR and North Star Fisheries, Appellants,

v.

TERRITORY OF ALASKA, Appellee.

NORTHERN REEFER COMPANY, Grimes Packing Company and Reefer II, Appellants,

v.

TERRITORY OF ALASKA, Appellee.

Nos. 15283–15288.

United States Court of Appeals
Ninth Circuit.
March 23, 1960.

John H. Dimond, Juneau, Alaska; Evans, McLaren, Lane, Powell & Beeks, Martin P. Detels, Jr., M. Bayard Crutcher, Seattle, Wash., for appellants.

In Case No. 15288 only, Bogle, Bogle & Gates, Seattle, Wash., for appellant together with John H. Dimond, Juneau, Alaska.

Gary Thurlow, Atty. Gen., Douglas Gregg, Asst. Atty. Gen., State of Alaska, for appellee.

Before CHAMBERS, Chief Judge, and STEPHENS, POPE, BARNES, HAMLEY, HAMLIN, JERTBERG, MERRILL, and KOELSCH, Circuit Judges.

HAMLEY, Circuit Judge.

These actions were brought by the Territory of Alaska to recover unpaid

license taxes incurred in the operation of freezer ships during the years 1951 through 1954. The partnerships and corporation which were named defendants denied liability. Four of them counterclaimed to recover taxes which they had paid.[1] The actions were consolidated for trial.

Judgment was entered for Alaska and against each defendant, the total award being $116,731.53. In support of this judgment the trial court filed an opinion containing findings of fact and conclusions of law in addition to a discussion of the issues. Territory of Alaska v. The Arctic Maid, D.C., 140 F.Supp. 190, 16 Alaska 126. In an unreported supplemental opinion thereafter filed there is further discussion of some of the issues.

Defendants have joined in this appeal. They raise a number of questions relating to the construction of the taxing statute, the territorial jurisdiction of Alaska over the business activity in question, and the validity of the tax, as applied, under certain constitutional and statutory provisions. Two of the defendants, Northern Reefer Company and Grimes Packing Company, present an additional question relating to the enforceability of a tax lien asserted against the freezer ship Reefer II.

The appeal was originally argued before a court consisting of two circuit judges and one district judge. After an opinion had been filed by the court as so constituted a rehearing en banc was granted. The previously entered opinion is hereby withdrawn and this opinion by the court en banc is entered in substitution therefor.

The facts necessary to be considered are not in dispute. Appellant Arctic Maid is a Washington corporation not qualified to do business in Alaska. The remaining appellants are partnerships, all members of which are residents of either the State of Washington or the State of California, and all are citizens of the United States. None of the co-partners resides in Alaska. All of the appellants operate canneries located on Puget Sound in the State of Washington. In order to obtain fish for their respective canneries they each send freezer ships to the waters adjacent to Alaska each year during the salmon season.

The freezer ships are vessels equipped with refrigeration and storage facilities for the freezing, storage, and transportation of fish. They are also equipped to provide transportation facilities for fishermen, and food and quarters for fishermen during the Alaska fishing season. In addition these freezer ships provide means for transporting "catcher" boats from Puget Sound to Alaskan fishing waters and back again at the end of the fishing season.

The fish are caught from the catcher boats, and are then transferred to the freezer ships. These catcher boats are of a general type commonly known as "Bristol Bay gillnetters." They are gas-powered vessels about thirty to thirty-two feet in length.

In most instances these gillnetters are owned by appellants and are transported from and returned to Puget Sound aboard the freezer ships. In some cases gillnetters owned by appellants are not transported to and from Puget Sound, but are stored ashore in the Bristol Bay area. In other instances appellants have contracted with others owning gillnetters to catch fish for the freezer ships during the salmon season.

The gillnetters are manned by fishermen—two to each boat—employed each season by appellants under the terms of the current Bristol Bay agreement between the salmon industry and the Alaska Fishermen's Union.[2] In addition to

---

1. The defendants are as named in the title of this action. The counterclaims were filed by Arctic Maid, Pacific Queen, Alaska Reefer, and North Star.

2. In broad outline the terms of employment of the fishermen provide that the defendants supply the gillnetters and all gear, pay the current seasonal price for the salmon caught and delivered to the freezer ships, provide food and quarters aboard the "mother ship," pay "run money" in the amount of $234 per man,

·obtaining fish through the use of gill-netters owned by or operated under contract with appellants, fish are also purchased from independent fishermen and taken aboard the freezer ships.

The freezer ships are utilized primarily in connection with the Bristol Bay red salmon season. They anchor seaward of a line drawn parallel to and at a distance of three miles from mean low tide mark on the shore of Bristol Bay and serve as a base for the operations of the gillnetters.

The gillnetters leave their respective freezer ships at the beginning of each open period during the fishing season and proceed to the fishing areas inshore. They traverse this inshore water, searching for fish, and return periodically to their freezer ships. The fish which have been caught are then transferred to the freezer ships by means of a net suspended from a boom. As the fishermen throw the fish into the net the fish are tallied by the crew of the freezer ship. The fishermen's pay is based upon the number of fish so tallied.

During some of the years here in question some of the appellants operated their freezer ships at other times or in other areas than during the Bristol Bay red salmon season. For example, freezer ships were sometimes utilized in the Bristol Bay king salmon season, or in the Kodiak, Cook Inlet, or Southeastern Alaska areas. During these operations, as distinguished from the Bristol Bay red salmon season, the freezer ships were operated at points closer to shore than three miles and obtained fish from catcher boats while so positioned.

When fish are taken aboard the freezer ships from the gillnetters owned or operated under contract by appellants, or after purchase from independent fishermen, they are dumped into quick-freezing brine tanks. The freezing begins immediately and continues over a period of ten to twelve hours. During this time the brine in the tank is constantly changed and circulated. At the end of ten to twelve hours the temperature of the fish has been lowered to twelve to fifteen degrees and they are fully frozen.

Traps in the bottom of the brine tanks are then opened and by means of a chute the fish are directed into the refrigerated hold where they are stored until discharged at destination on Puget Sound. The brine tanks themselves are sometimes used for the storage of fish.[3]

At the conclusion of the operations in waters adjacent to Alaska appellants take on board the gillnetters which had been transported from Puget Sound on the freezer ships. Appellants then return these freezer ships to Puget Sound and discharge the frozen fish at their respective canneries. During the years in question all but five hundred pounds of the frozen fish so transported to Puget Sound were canned there by appellants.

The Alaska license tax here in question has its genesis in Session Laws of Alaska 1949, chapter 97. Under this 1949 statute a one-per-cent annual license tax was imposed upon persons, firms, or corporations prosecuting certain lines of business. The specified lines of business were "cold storage and other fish processors, except salmon canneries, herring processing plants, crab canneries and clam canneries otherwise licensed: * * *." It was provided that the annual tax would be equal to one per cent of the value of the fish " * * * bought or otherwise obtained for processing through freezing, salting or other method."

It will be observed that in so far as cold storages are concerned no distinction was drawn in the 1949 statute be-

---

furnish air transportation in one direction if desired by the fisherman, and provide fuel for the operation of the gillnetter.

**3.** During the 1951 season the freezing method employed aboard the vessel Pacific Queen was the so-called "air-blast" method. Under this method the fish are placed in racks and set into a freezing compartment where they are subjected to blasts of air at a sub-freezing temperature until fully frozen.

tween shore-based plants and freezer ships or other floating cold storages. All were to be taxed at the rate of one per cent of the value of the raw fish.

Such a distinction was drawn in 1951, however, when the territorial legislature enacted chapter 116, amending chapter 97, Sess.Laws Alaska 1949. In the 1951 enactment the lines of business to be taxed were divided into two groups. The first, consisting of "shore based cold storages and all other fish processors, except salmon canneries, herring processing plants, crab canneries and clam canneries otherwise licensed: * * *.," were taxed at the 1949 rate of one per cent. The second group, consisting of "freezer ships and other floating cold storages," were taxed at the rate of four per cent.[4]

In 1949 Alaska also imposed a four-per-cent license tax on salmon canneries, both shore-based and floating (Sess.Laws Alaska 1949, ch. 82). This tax was raised to six per cent in 1951. Sess.Laws Alaska 1951, ch. 113, Alaska Comp.Laws, Cum.Supp.1958, § 35–1–91.[5] Also in 1949 Alaska imposed a five-dollar annual license fee for resident commercial fishermen who take fish from the fishery resources of Alaska, and a fifty-dollar annual license fee on nonresident commercial fishermen engaged in the same activity. Sess.Laws Alaska 1949, ch. 66. This tax was thereafter declared invalid. Anderson v. Mullaney, 9 Cir., 191 F.2d 123, affirmed sub nom. Mullaney v. Anderson, 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458.

One of the contentions made by appellants on this appeal is that the tax in question, as applied, imposes an undue burden on and discriminates against interstate commerce, and is an attempted regulation of interstate commerce, all in violation of Article I, section 8, of the Constitution. If this contention is well founded, it is dispositive of the entire case, since the tax would then be wholly invalid and unenforceable. We therefore

4. Sess.Laws Alaska 1951, chapter 116, reads as follows:

Section 1. Section 1 of Chapter 97, Session Laws of Alaska, 1949, is hereby amended to read as follows:

"Section 1. Business in Alaska Fisheries Requiring Licenses: Amounts Thereof. Any person, firm or corporation prosecuting or attempting to prosecute any of the following lines of business in connection with Alaska's commercial fisheries shall first apply for and obtain, on the conditions hereinafter set forth, a license so to do on the basis of the following license taxes which are hereby levied:

"(a) Shore based cold storages and all other fish processors, except salmon canneries, herring processing plants, crab canneries and clam canneries otherwise licensed: An annual license tax equal to 1% of the value of the raw halibut, halibut livers and viscera, salmon and bottom fish, shellfish or other fishing resource bought or otherwise obtained for processing through freezing, salting or other method. The value of the raw material under this license shall be the actual price paid for same including indirect considerations such as fuel or supplies furnished by the processor or offsets to the cash value for gear furnished etc. Such value shall apply to the raw material herein mentioned which is pro-

cured in company owned or subsidized boats operated by employees of the processor or under lease or other arrangement.

"(b) Freezer ships and other floating cold storages: An annual license tax equal to 4% of the value of the raw halibut, halibut livers and viscera, salmon and bottom fish, shellfish or other fishing resource bought or otherwise obtained for processing through freezing. The value of the raw material under this license shall be the actual price paid for same including indirect considerations such as fuel or supplies furnished by the processor or offsets to the cash value for gear furnished etc. Such value shall apply to the raw material herein mentioned which is procured in company owned or subsidized boats operated by employees of the processor or under lease or other arrangement.

"Section 2. An emergency is hereby declared to exist and this Act shall take effect immediately upon its passage and approval."

5. This tax was computed on a somewhat different basis then the tax on shore-based cold storages and freezer ships and other floating cold storages, but the difference is immaterial for present purposes.

proceed at once to a consideration of this question.

In asserting that the freezer-ship tax here in question is invalid under the Commerce Clause, appellants advance two arguments. The first is that the activity sought to be taxed is an inseparable part of interstate commerce and so is not subject to any state or territorial privilege tax. The second is that the statute, as enacted and administered, discriminates against the interstate transportation of salmon caught in Alaskan waters for canning outside of Alaska and in favor of the canning of such salmon within Alaska.

In dealing with either of these arguments it is first necessary to determine what business activity was intended to be taxed. Part of the activity of freezer ships, including at the very least the moving of the vessels to and from Bristol Bay and Puget Sound, occurs beyond the territorial jurisdiction of Alaska. If the tax is intended to include this extraterritorial activity of freezer ships, the tax is invalid—not under the Commerce Clause, but under the Due Process Clauses of the Fifth and Fourteenth Amendments.[6]

But, despite the broad language of chapter 116 in taxing the prosecution of the "line of business" of freezer ships, we are unwilling to believe that the legislature intended to impose such a clearly unconstitutional tax. Where a statute is reasonably susceptible of two constructions, that construction will ordinarily be accepted which avoids invalidation on a constitutional ground.[7]

Under all of the facts it is reasonable to assume that the freezer-ship activities which the territorial legislature had in mind and intended to tax did not include any which occurred while the freezer ships were beyond territorial waters.

A serious question is raised on this appeal as to whether the freezer ships while at anchor beyond the three-mile limit in Bristol Bay were in territorial waters. For the purpose of considering the Commerce Clause question we will assume that they were. It follows under this assumption that all activities of the "line of business" of freezer ships, carried on while the freezer ships were at anchor, were subject to Alaskan tax jurisdiction unless precluded by the Commerce Clause.

The question remains, however, whether chapter 116 was intended as a tax on all activity while the freezer ships were at anchor. The prime activity was the freezing and cold storage of fish preparatory to transporting the fish in interstate commerce for canning elsewhere. But, as an integrated part of the business of operating freezer ships, catcher boats owned or under contract to appellants were utilized in the catching of fish which were then taken aboard the freezer ships.

The trial court held that chapter 116 was not intended as a tax upon the activity of the freezer ships in freezing fish and maintaining the fish in cold storage. Rather, that court held, the only activity of freezer ships intended to be taxed under that chapter was the one of taking fish in territorial waters through utilization of catcher boats owned by or under contract to appellants.

In our opinion, however, the catching of fish is not the tax incident or a part of the tax incident contemplated by § 1(b) of chapter 116, taxing freezer ships. As therein provided, the tax is four per cent of the value of raw fish "bought or otherwise obtained for processing through freezing." The tax therefore applies whether or not the fish are caught by gillnetters owned by or under contract

6. Miller Bros. Company v. State of Maryland, 347 U.S. 340, 342, 74 S.Ct. 535, 98 L.Ed. 744; Safe Deposit & Trust Co. of Baltimore, Md. v. Commonwealth of Virginia, 280 U.S. 83, 50 S.Ct. 59, 74 L. Ed. 180; International Paper Co. v. Commonwealth of Massachusetts, 246 U.S. 135, 141, 38 S.Ct. 292, 62 L.Ed. 624.

7. United States v. Witkovich, 353 U.S. 194, 201, 77 S.Ct. 779, 1 L.Ed.2d 765; Singer Sewing Machine Co. v. Brickell, 233 U.S. 304, 34 S.Ct. 493, 58 L.Ed. 974.

to appellants. The emphasis in the quoted statutory words is on the purpose of acquisition—not the manner of acquisition. The purpose which gives rise to the tax is "processing through freezing."

Thus it is the freezer-ship activity of processing through freezing which is taxed. The value of raw fish bought or otherwise obtained is referred to only in specifying the method of computing the tax. Likewise, under section 1(a) of chapter 116 the shore-based cold-storage activity which is taxed is that of "processing through freezing," whether the fish are acquired by purchase or otherwise.[8] Similarly, under Sess.Laws Alaska 1951, chapter 113, the salmon cannery activity which is taxed is that of "canning," whether the raw fish are "purchased or otherwise obtained."[9]

In concluding that the only activity here being taxed is the taking of fish, the trial court likened Sess.Laws Alaska 1951, chapter 116, to the taxing statutes which were upheld in Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460, and Oliver Iron Mining Co. v. Lord, 262 U.S. 172, 43 S.Ct. 526, 67 L.Ed. 929.

In Toomer nonresident owners of commercial shrimp trawlers resisted a South Carolina tax of one-eighth cent a pound on green, or raw, shrimp taken within three miles of the coast of that state.[10] In holding that the tax was not invalid under the Commerce Clause, the court stated that the taxable event was the taking of shrimp.

Since the only activity involved in Toomer was that of operating commercial shrimp trawlers, the taxable event was necessarily the catching of shrimp. Here, however, the activity named in the taxing statute is that of operating freezer ships, the prime function of which is the freezing of fish. The holding in Toomer, that the taxable event there in question was the taking of fish, therefore provides no guidance which is helpful here.

We reach the same conclusion with respect to Oliver Iron Mining Co. v. Lord, supra, also relied upon by the trial court. In that case a six-per-cent occupation tax was levied upon "every person engaged in the business of mining or producing iron ore or other ores in this state * * *." M.S.A. § 298.01. It was provided that the tax would be equal to six per cent of the valuation of the ore mined or produced. In upholding the tax against a Commerce Clause challenge the court stated that the tax was levied on the business of mining ore. Since the only activity there in question was the mining of ore, the court's conclusion as to the taxable event necessarily followed.

We hold that the only tax incident defined in chapter 116 is the freezing and cold storage of fish aboard freezer ships while the ships are at anchor in what we, for present purposes, assume to be territorial waters.

As before noted, it is one of appellants' contentions under their Commerce Clause

8. The testimony is undisputed that shore-based cold storages do not use catcher boats of their own. It also appears probable, though the evidence is not explicit on this, that much of the troll-caught fish used by shore-based cold storages are caught on the high seas. Hence, if the license tax on shore-based cold storages, which (except for the rate of tax) is to be computed in the same manner as for freezer ships, is deemed to be a tax on the catching of fish, Alaska is taxing shore-based cold storages on an extraterritorial activity of independent fishermen.

9. Should it be held that the activity taxed under these three provisions is or includes the catching of fish, a grave due

process question would be presented. This arises from the fact that the territorial legislature would then be chargeable with placing in one class and taxing the catching of fish by the use of boats owned by or operated for freezer ships, while placing in another class and not taxing the catching of fish by independent fishermen.

10. The South Carolina statute, Code 1942, § 3374, provided:
"The following fisheries' tax is hereby imposed upon all fish or fisheries products taken or canned, shucked or shipped for market, to-wit * * * on each pound of green shrimp, one-eighth of one cent. * * *"

point that this activity is an inseparable part of interstate commerce and so is not subject to any privilege tax, whether or not discriminatory.

■ The basic premise of this argument is established law. A state may not lay a tax on the "privilege" of engaging in interstate commerce.[11] Where this is the nature of the tax the Commerce Clause forbids its imposition, whether or not discriminatory and regardless of the amount of the tax or the method of computation.[12] Likewise, the fact that the taxpayer has received benefits through local conservation measures is immaterial. Michigan-Wisconsin Pipe Line Co. v. Calvert, 347 U.S. 157, 163–164, 74 S.Ct. 396, 98 L.Ed. 583.

■ It is to be noted that the cases draw a clear distinction between the privilege taxes and state exactions taking the form of compensation for the use of highways, collections in lieu of an ad valorem property tax, inspection fees, taxes on sales or use, excise or privilege taxes on activities before interstate commerce begins and after it ends, or fairly apportioned net income taxes. All of the latter may be the subject of nondiscriminatory state or local impositions.[13] But the right to engage in interstate commerce is not a privilege conferred by state or local government, and may not be taxed as such.

The critical question, then, is whether the activity of freezing and cold storing fish, engaged in by freezer ships while lying at anchor in territorial waters preparatory to transporting such fish to the State of Washington for canning, is an inseparable part of interstate commerce.

If so, any territorial privilege tax thereon is forbidden by the Commerce Clause.

The freezing and cold-storage activity in question is a "local" activity in the sense that under the assumptions here made it takes place within Alaskan territorial jurisdiction. This is true of most interstate commerce activity. The individual phases thereof take place within the boundaries of one state or another, except, as in this case, where part of the transportation is on the high seas. But if such local activity is of a kind which cannot be separated from the interstate process, the flow of commerce, it must be regarded as an integral part of interstate commerce. Michigan-Wisconsin Pipe Line Co. v. Calvert, supra, 347 U.S. at page 166, 74 S.Ct. at page 400.

In determining whether the activity here in question can be separated from the interstate process, the flow of commerce, the case of Joseph v. Carter & Weekes Stevedoring Co., supra, provides helpful guidance. In that case a nondiscriminatory municipal excise tax on the gross receipts of a stevedoring company engaged in loading and unloading vessels moving in interstate and foreign commerce was declared invalid under the Commerce Clause. In holding that such a tax is not apportioned to income derived from activities within the taxing state, the court stated (330 U.S. at pages 427–428, 67 S.Ct. at page 818):

"The transportation in commerce, at the least, begins with loading and ends with unloading. Loading and unloading has effect on transportation outside the taxing state because those activities are not only prelimi-

---

11. Northwestern States Portland Cement Co. v. State of Minnesota, 358 U.S. 450, 458, 79 S.Ct. 357, 3 L.Ed.2d 421; Spector Motor Service, Inc. v. O'Connor, 340 U.S. 602, 610, 71 S.Ct. 508, 95 L.Ed. 573; Joseph v. Carter & Weekes Stevedoring Co., 330 U.S. 422, 433, 67 S.Ct. 815, 91 L.Ed. 993; McGoldrick v. Berwind-White Coal Mining Co., 309 U.S. 33, 48, 60 S.Ct. 388, 84 L.Ed. 565.

12. Spector Motor Service, Inc. v. O'Connor, supra, 340 U.S. at page 607, 71 S.Ct.

at page 511; Joseph v. Carter & Weekes Stevedoring Co., supra, 330 U.S. at page 433, 67 S.Ct. at page 821.

13. Northwestern States Portland Cement Co. v. State of Minnesota, supra, 358 U.S. at pages 458–459, 79 S.Ct. at page 362; Spector Motor Service, Inc. v. O'Connor, supra, 340 U.S. at page 607, 71 S.Ct. at page 511; McGoldrick v. Berwind-White Coal Mining Co., supra, 309 U.S. at page 47, 60 S.Ct. at page 392.

**128**

nary to but are an essential part of the safety and convenience of the transportation itself." [14]

The activity being taxed in our case, the freezing and cold storage of fish engaged in by the line of business of freezer ships, takes place after the fish are loaded on the vessel which is to transport them in interstate commerce. Thus, applying the "loading and unloading" test of the Joseph and Richfield Oil Corporation cases, supra, this freezing and cold-storage activity takes place after the flow of interstate commerce has begun, and is therefore an integral part of such commerce.

But, apart from the somewhat mechanical test of whether the activity takes place with or after loading on the interstate vehicle, the rationale of the Joseph decision calls for the same conclusion. In that case loading of cargo on the interstate carrier was held to be an activity in interstate commerce because it involved the transportation vehicle itself and was preliminary to and an essential part of the safety and convenience of that transportation. Likewise here, the freezing and cold-storage activity takes place after the fish are loaded on the interstate carrier and is preliminary to and an essential part of the transportation itself. This freezing and cold storage is solely for the purpose of preserving the fish so that they may be so transported, such transportation being otherwise impossible.

■■ Appellants make no contention that the activity of catching fish in Alaskan waters would not be amenable to a nondiscriminatory local privilege tax. Toomer v. Witsell, supra, establishes that such an activity may be taxed. See, also, Anderson v. Mullaney, supra, 191 F.2d at page 129. But where, as here, the processing activity constituting the tax

14. See, also, Richfield Oil Corp. v. State Board of Equalization, 329 U.S. 69, 83, 67 S.Ct. 156, 164, 91 L.Ed. 80, where the court said: " * * * the commencement of the export would occur no later than the delivery of the oil into the vessel." In Michigan-Wisconsin Pipe Line

event occurs subsequent to loading the product on the interstate carrier and is indispensable to such transportation, any local privilege tax thereon is forbidden by the Commerce Clause.

The judgment is reversed and the cause is remanded with directions to enter judgment for appellants on the tax claims, and to adjudicate the counterclaims.

Co. v. Calvert, supra, the activity sought to be taxed included processing after the product, natural gas, had passed into the facilities of the interstate carrier. The tax was declared invalid under the Commerce Clause.