SPRINGFIELD INSURANCE COMPANY *vs.* STATE TAX
COMMISSION.

Suffolk.    April 3, 1961. — May 1, 1961.

Present: WILKINS, C.J., SPALDING, WILLIAMS, & CUTTER, JJ.

*Taxation,* Insurance company, Foreign commerce, Exports or imports, Domestic corporation. *Constitutional Law,* Foreign commerce, Insurance, Taxation of exports or imports, Due process of law.

In computing the excise imposed under G. L. c. 63, § 22, as amended through St. 1946, c. 387, § 1, on a domestic insurance company which wrote and delivered policies in a foreign country on risks there through its foreign manager there and through the manager received premiums on such policies paid there, upon which it was not taxed there, inclusion of such premiums in the measure of the excise as required by § 22 was, by reason of the Federal McCarran Act, 15 U. S. C. (1958) §§ 1011–1015, not unconstitutional as a burden on foreign commerce contrary to art. 1, § 8, of the Federal Constitution; nor was such inclusion uncon-

stitutional as a tax on imports or exports contrary to art. 1, § 10; nor was such inclusion unconstitutional as a denial of due process of law contrary to the Fourteenth Amendment.

APPEAL from a decision by the Appellate Tax Board.

*William Shelmerdine, Jr.,* (*Stephen A. Moore* with him,) for the taxpayer.

*Herbert E. Tucker, Jr.,* Assistant Attorney General, for the State Tax Commission.

CUTTER, J. The insurance company (Springfield) was incorporated in Massachusetts and is subject to G. L. c. 175. It has its home office and principal place of business here.

Springfield is a member of American Foreign Insurance Association (AFIA) which develops for twenty-four member companies insurance business covering risks in certain foreign territory. AFIA acts as a foreign manager for Springfield in such territory and Springfield there insures risks through AFIA. In 1952, Springfield through AFIA entered into insurance covering risks in Hong Kong and Surinam and received from these risks in premiums $71,946.86 and $4,067.13 respectively. The contracts "were entered into through a foreign branch . . . of" AFIA or through AFIA agents soliciting in foreign countries. "Policies were delivered" by AFIA to each purchaser at his residence or place of business. Premiums were paid to AFIA and were deposited at the place of purchase to meet claims and expenses. Balances, after deducting normal operating costs, were transmitted to AFIA's home office to be distributed to its member companies, including Springfield.

Springfield was qualified to do business in Hong Kong and Surinam, neither of which imposes a gross premium tax or excise. AFIA paid in each place stamp taxes imposed upon documents of insurance as well as other documents.

On February 27, 1953, Springfield filed its premium excise return, G. L. c. 63, § 25 (as amended through St. 1945, c. 721, § 4; see later amendment, St. 1953, c. 654, § 53), but did not include in computing the measure of the excise (see

§ 22, discussed *infra*) the 1952 premiums from risks in Hong Kong and Surinam. An additional 1953 excise of $2,189.20 was later imposed based upon the inclusion of these 1952 premiums within the measure of the 1953 excise levied under G. L. c. 63, § 22 (as amended through St. 1946, c. 387, § 1).[1] Springfield applied for abatement of the additional excise contending "that the assessment based upon premiums for business written in foreign countries imposes an undue burden on foreign or interstate commerce and therefore violates" art. 1, § 8, of the Federal Constitution. The State Tax Commission denied the application. Before the Appellate Tax Board, Springfield also contended that the additional excise was in violation of art. 1, § 10, cl. 2, and of the Fourteenth Amendment to the Federal Constitution. The Appellate Tax Board entered a decision for the commission. Springfield appealed.

1. The history of the excise now imposed by G. L. c. 63, § 22 (see footnote 1, *supra*), reviewed in *Commissioner of Corps. & Taxn.* v. *Boston Ins. Co.* 328 Mass. 641, need not be repeated. The tax is "an excise upon the franchise of . . . a company as existing at a given date." See *Commissioner of Ins.* v. *Commonwealth Mut. Liab. Ins. Co.* 308 Mass. 385, 396. That case dealt with § 22, as appearing in G. L. (Ter. Ed.) c. 63, but the same principles are applicable to the present § 22, despite more recent minor amendments. See St. 1945, c. 721, § 1; St. 1946, c. 387, § 1. It was recognized (at pp. 394–395) that the insurance excise was in nature and impact comparable to the excise on sav-

---

[1] Section 22, as thus amended, reads, "Every domestic insurance company . . . [with exceptions not material] shall annually pay an excise of one per cent upon the gross premiums for all policies written or renewed, all additional premiums charged, and all assessments made by such company on policyholders during the preceding calendar year, exclusive of reinsurance; but such premiums and assessments for policies . . . for insurance . . . of property or interests in other states or countries *where a tax is actually paid by such company, or its agents, shall not be so taxed*" (emphasis supplied). Springfield is a domestic company. See G. L. c. 175, § 1. The tax imposed by § 22 is similar to, although by no means precisely like, premium taxes imposed by many other States. See Appleman, Insurance Law & Practice, §§ 10,581-10,592. The rate of the 1953 excise was increased to two per cent by St. 1951, c. 386, § 6. See St. 1959, c. 31, § 8. Cf. excise on foreign insurance companies, G. L. c. 63, § 23, as amended through St. 1946, c. 387, § 2.

ings banks originally also imposed by the same statute.
See St. 1862, c. 224, §§ 1, 4, 8. Accordingly, the language
in *Commonwealth* v. *People's Five Cents Sav. Bank,* 5
Allen, 428, 437–438, describing the early savings bank ex-
cise, is applicable to the excise imposed under § 22, viz.
"[t]he subject to be taxed was the . . . existing value of
the franchises . . . that is, the amount of benefit . . . which
the charter . . . conferred on those who held it and en-
joyed its privileges. . . . The excise is not laid on the
business which each . . . [company] has transacted" dur-
ing a preceding period, but "upon the value of the fran-
chise" at the end of the period. See also *Commonwealth*
v. *Provident Inst. for Sav.* 12 Allen, 312, 314–315, affd. sub.
nom. *Provident Inst.* v. *Massachusetts,* 6 Wall. 611.

In the *Boston Ins. Co.* case, this court held that a domes-
tic insurance company, which paid no premium tax in Can-
ada on policies issued there, must include the premiums for
such policies within the measure of the excise imposed by
§ 22, regardless of the circumstance that the company paid
various license and registration taxes and fees in Canada.
The court (at pp. 644–646) said that, under § 22 premiums
of domestic companies are to be exempt only where "a tax
on [such] premiums" is actually paid in another jurisdic-
tion. "The purpose . . . is to avoid double taxation."
In the light of these decisions, we hold that under § 22 the
measure of the franchise tax includes the additional pre-
miums now in dispute.

2. Springfield first submits that Massachusetts imposes
an unconstitutional burden on interstate and foreign com-
merce by including within the excise measure premiums on
Hong Kong and Surinam risks. For many years, in reli-
ance upon *Paul* v. *Virginia,* 8 Wall. 168, 182–183, insurance
contracts were regarded not as "inter-state transactions"
but as "local transactions" not constituting "commerce
between the States." This view was unsettled by *United
States* v. *South-Eastern Underwriters Assn.* 322 U. S. 533,
holding in effect that the Congress did not intend that insur-
ance should be exempt from the operation of the Sherman

Act and that insurance was interstate commerce. The
"Congress then enacted the McCarran Act," now found in
15 U. S. C. §§ 1011–1015 (1958). See *Insurance Co. of No.
America* v. *Commissioner of Ins.* 327 Mass. 745, 747–748.
Pertinent provisions of the McCarran Act are set out in the
margin.[2] The purpose of the act was stated (House Rep.
No. 143, 79th Cong. 1st Sess.) by the House Committee on
the Judiciary. The committee pointed out that the *South-
Eastern Underwriters* case had "raised questions . . . as to
the validity of State tax laws as well as State regulatory
provisions; thus making desirable legislation by the Con-
gress." The legislation was recommended "so that the
several States may know that the Congress desires to pro-
tect the continued regulation and taxation of the business
of insurance by the several States." The committee said,
however, that the legislation was not intended "to clothe
the States with any power to . . . tax . . . insurance beyond
that which they had been held to possess prior to the"
*South-Eastern Underwriters* decision, but announced that
it desired to "provide for the continued regulation and
taxation of insurance by the States, subject always, how-
ever, to the limitations set out in" the controlling decisions
of the Supreme Court, as, for instance, in *Allgeyer* v. *Loui-
siana,* 165 U. S. 578, 591–593, *St. Louis Cotton Compress Co.*
v. *Arkansas,* 260 U. S. 346, 348, and *Connecticut Gen. Life
Ins. Co.* v. *Johnson,* 303 U. S. 77, 81–82, "which hold, inter
alia, that a State . . . [may] not . . . tax contracts of insur-
ance . . . entered into outside its jurisdiction by . . . [per-
sons] domiciled therein covering risks within the State," a
situation different from that here presented.

---

[2] 15 U. S. C. § 1011 (1958) "Congress declares that the continued regulation
and taxation by the several States of the business of insurance is in the public
interest, and that silence on the part of the Congress shall not be construed to
impose any barrier to the regulation or taxation of such business by the several
States. § 1012. . . . (a) The business of insurance . . . shall be subject to
the laws of the several States which relate to the regulation or taxation of such
business. (b) No Act of Congress shall be construed to invalidate . . . or
supersede any law enacted by any State for the purpose of regulating the
business of insurance, or which imposes a fee or tax upon such business, unless
such Act specifically relates to the business of insurance: Provided [proviso
makes certain antitrust legislation 'applicable to . . . insurance to the extent
that such business is not regulated by State law']."

In *Prudential Ins. Co.* v. *Benjamin*, 328 U. S. 408, the Supreme Court held valid a South Carolina tax of three per cent upon premiums from interstate and local business done within that State by foreign insurance companies although no similar tax was imposed on South Carolina corporations. The court said (p. 427) that it was "not required to determine whether South Carolina's tax would be valid [under the commerce clause] in the dormancy of Congress' power. . . . Congress has expressly stated its intent . . . in the [McCarran] Act." The court assumed (at p. 429) "that the tax would be discriminatory . . . and that . . . [Prudential's] business . . . [taxed] in South Carolina . . . [was] interstate commerce." It assumed also (p. 430) that the "Congress . . . had full knowledge of the nation-wide existence of [S]tate systems of regulation and taxation; [and] of the fact that they differ greatly . . . its purpose was . . . to throw the whole weight of its power behind the [S]tate systems, notwithstanding these variations." The court, however, did not view the McCarran Act as necessarily validating "every . . . [S]tate . . . tax. For in all that mass of legislation must have lain . . . provisions . . . subject to serious question on the score of other constitutional limitations in addition to commerce clause objections arising in the dormancy of Congress' power." On these assumptions, the court held that the McCarran Act "necessarily was a determination by Congress that [S]tate taxes, which in its silence might be held invalid as discriminatory, do not place on interstate insurance business a burden which it is unable generally to bear or should not bear in the competition with local business."

We interpret the *Prudential* case (328 U. S. 408, esp. 427–430) as declaring that an excise measured by premiums, even if discriminatory, imposes no invalid or forbidden burden[3] upon interstate commerce, and as sustaining

---

[3] The broad language of the *Prudential* case appears to make irrelevant to insurance activities commerce clause considerations stated in cases like *Crew Levick Co.* v. *Pennsylvania*, 245 U. S. 292, 295, and *Joseph* v. *Carter & Weekes Stevedoring Co.* 330 U. S. 422, 427–435. For discussions of the *Prudential* case, see Donovan, Regulation of Insurance under the McCarran Act, 15 Law & Cont. Prob. 473, 479; Tye, Regulation and Taxation of Interstate Insurance, 1946 Ins. L. J. 373; notes 45 Mich. L. Rev. 363; 4 Wash. & Lee L. Rev. 157.

the McCarran Act's affirmative authorization of such State taxes, notwithstanding any alleged burden upon interstate (or foreign) commerce, at least if they do not violate other constitutional limitations.  This, in substance, is the view of the *Prudential* decision adopted in *Guardian Life Ins. Co.* v. *Chapman,* 302 N. Y. 226, 240–241[4].  See *Wilburn Boat Co.* v. *Fireman's Fund Ins. Co.* 348 U. S. 310, 316–321; *Federal Trade Commn.* v. *National Cas. Co.* 357 U. S. 560, 562–565.  See also *Maryland Cas. Co.* v. *Cushing,* 347 U. S. 409, 413, 436–437.  Cf. *Securities & Exch. Commn.* v. *Variable Annuity Life Ins. Co.* 359 U. S. 65, 68; *Federal Trade Commn.* v. *Travelers Health Assn.* 362 U. S. 293, 299–302.

We are here concerned not with interstate commerce, but with an excise, measured in part by foreign premiums, which is alleged to burden foreign commerce.  The commerce clause, the source of Congressional power to regulate insurance and its taxation, applies equally to "commerce with foreign nations, and among the several states."  U. S. Const. art. 1, § 8, cl. 3.  The language of the McCarran Act and the reasoning of the *Prudential* case are as appropriate to foreign commerce as to interstate commerce, and the act equally affects foreign and domestic commerce.  If the insurance written for Springfield in Hong Kong and Surinam is foreign commerce, the McCarran Act leaves Massachusetts free to impose an excise, otherwise valid, measured by the premiums from that business.

The additional excise imposes no tax on either imports or exports in violation of the Federal Constitution.  See art. 1, § 9, cl. 5 ("No tax or duty shall be laid on articles exported from any state"), and art. 1, § 10, cl. 2 ("No state shall, without the consent of the congress, lay any imposts or duties on imports or exports . . ."). Article 1, § 9, limits only the powers of the Congress, not those of the

---

[4] The McCarran Act, by giving Congressional consent to State insurance taxes affecting commerce, makes largely irrelevant considerations discussed in *State Tax Commn.* v. *John H. Breck, Inc.* 336 Mass. 277, 289–298, applicable to State excise taxes on ordinary business and manufacturing corporations. There is also no occasion to discuss the similar considerations dealt with in *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U. S. 450, 458–465.

States. See *Munn* v. *Illinois,* 94 U. S. 113, 135; *Johnson* v. *Chicago & Pac. Elev. Co.* 119 U. S. 388, 400; *Richfield Oil Corp.* v. *State Bd. of Equalization,* 329 U. S. 69, 76–77; *Emprese Siderurgica, S. A.* v. *County of Merced,* 337 U. S. 154, 156. See also *A. G. Spalding & Bros.* v. *Edwards,* 262 U. S. 66, 69. Article 1, § 10, cl. 2, applies to the States, but has been interpreted principally as preventing taxes upon tangible goods which have so entered into or remained in the stream of foreign commerce as to be recognizable as imports and exports.[5] It also may apply to taxes on documents or activities essential to importation and exportation of goods, if the taxes are the equivalent of a direct tax upon the goods. See the *Richfield Oil Corp.* case, *supra,* at pp. 78–86. Cf. *Canton R.R.* v. *Rogan,* 340 U. S. 511, 513–515. Cf. also *William E. Peck & Co. Inc.* v. *Lowe,* 247 U. S. 165, 173–175 (general Federal tax on net income from exporting); *National Paper & Type Co.* v. *Bowers,* 266 U. S. 373, 376–377; *Barclay & Co. Inc.* v. *Edwards,* 267 U. S. 442, 447–451.

The additional excise is imposed upon Springfield's franchise. It is not a tax upon the tangible policy documents, if, indeed, they are shipped from Massachusetts to Hong Kong or Surinam, or directly upon the premiums themselves or the periodical transmission of the net premiums from the Orient to Springfield, or upon any export of Springfield's capital for employment in Surinam and Hong Kong. We see in the excise imposed by § 22 no such direct or indirect relation to imports or exports as would make relevant art. 1, § 10, cl. 2. We need not consider whether insurance can be the subject of an export or whether, by the McCarran Act, the Congress in any event has given its consent, within the meaning of art. 1, § 10, cl. 2, to the type of excise here imposed.

3. Springfield contends that the additional excise, by in-

---

[5] See as to the demarcation between "imports" and "exports," on the one hand, and goods which have not become, or have ceased to be, identifiable as such, *Youngstown Sheet & Tube Co.* v. *Bowers,* 358 U. S. 534, 540–541, which reviews the earlier decisions. See also *Michigan-Wisconsin Pipe Line Co.* v. *Calvert,* 347 U. S. 157, 166–170; notes 51 Col. L. Rev. 250; 13 Md. L. Rev. 163.

cluding within its measure gross premiums from foreign business, also violates the due process clause of the Fourteenth Amendment to the Federal Constitution because such premiums are not subject to the "control and protection" of this Commonwealth. We thus are asked to consider the validity of the Massachusetts practice, nearly a century old, in measuring its excise upon domestic insurance companies by gross premiums during a recent period (see St. 1862, c. 224, § 5) excluding, in order to avoid double taxation, those subjected to a premium tax elsewhere.[6]

States are permitted to make fair approximations of the value of franchises and privileges in imposing excises upon the corporations which they have created. See *State Tax Commn.* v. *John H. Breck, Inc.* 336 Mass. 277, 300. See also *International Harvester Co.* v. *Evatt*, 329 U. S. 416, 421–423, where the Supreme Court sustained an apportionment formula designed "to arrive, without undue complication, at a fair conclusion as to what was the value of the intrastate business for which" a foreign corporation was assessed an Ohio franchise tax. The court recognized (at p. 422) that, in comparable State tax situations, " 'rough approximation rather than precision' is sufficient." For a franchise tax upon a domestic corporation many different, and not wholly precise, measures of franchise value have been held permissible.[7] Indeed, some of these reflect values which the domiciliary State could not have taxed directly. See *Educational Films Corp.* v. *Ward*, 282 U. S. 379, 388–392; *Pacific Co. Ltd.* v. *Johnson*, 285 U. S. 480, 495–496; *Werner Mach.*

---

[6] See St. 1862, c. 224, § 1, and St. 1865, c. 283, § 18. Statute 1919, c. 349, § 9, amended what is now § 22 to permit the exclusion of premiums taxed in other countries, as a consequence of the recommendation of the Joint Special Committee on Taxation, 1919. See 1919 Sen. Doc. No. 313, pp. 78, 111. The committee report suggests that foreign premiums may have just begun to present a problem in 1919.

[7] See *Society for Sav.* v. *Coite*, 6 Wall. 594, 606–611 (deposits); *Provident Inst.* v. *Massachusetts*, 6 Wall. 611, 630–632 (deposits); *Hamilton Co.* v. *Massachusetts*, 6 Wall. 632, 635–638 (excess of value of capital stock over locally taxed tangibles); *The Delaware R.R. Tax*, 18 Wall. 206, 229–232 (value of stock); *Home Ins. Co.* v. *New York*, 134 U. S. 594, 599–600, 606 (dividends); *Henderson Bridge Co.* v. *Kentucky*, 166 U. S. 150, 154–155 (intangibles); *Kansas City, Fort Scott & Memphis Ry.* v. *Botkin*, 240 U. S. 227, 232–235 (graduated excise according to capital); *Kansas City, Memphis & Birmingham R.R.* v. *Stiles*, 242 U. S. 111, 116–120 (percentage of capital stock); *Schwab* v. *Richardson*, 263 U. S. 88, 92–93 (intangible values of capital stock apportioned by formula).

*Co. Inc.* v. *Director of Div. of Taxn.* 350 U. S. 492, 493–494. See also *Flint* v. *Stone Tracy Co.* 220 U. S. 107, 163–167.[8]

The breadth of the States' power to tax the franchises of domestic corporations finds support in their power to tax their domiciliaries' income from sources outside the State and their intangibles held elsewhere; see *Maguire* v. *Trefry,* 253 U. S. 12, 14–17 (affg. *Maguire* v. *Tax Commr.* 230 Mass. 503); *Lawrence* v. *State Tax Commn.* 286 U. S. 276, 279–281, and cases cited; *New York* v. *Graves,* 300 U. S. 308, 312–315; *Greenough* v. *Tax Assessors,* 331 U. S. 486, 490–497; and, perhaps also, in the power to impose death duties on the transfer of domiciliaries' intangible property reflecting out of State values. See *Curry* v. *McCanless,* 307 U. S. 357, 363–374, esp. at 368; *Graves* v. *Schmidlapp,* 315 U. S. 657, 662–665. See also *Graves* v. *Elliott,* 307 U. S. 383, 386–387; *State Tax Commn.* v. *Aldrich,* 316 U. S. 174, 176–182; *Hanson* v. *Denckla,* 357 U. S. 235, 246–247; Howard, State Jurisdiction to Tax Intangibles, 8 Mo. L. Rev. 155. Even in respect of taxes treated essentially as property taxes (although some may have been excises), the Supreme Court has recognized that the State of incorporation has especially broad power to tax its corporate creatures. See *Cream of Wheat Co.* v. *Grand Forks,* 253 U. S. 325, 328; *Northwest Airlines, Inc.* v. *Minnesota,* 322 U. S. 292, 294; *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U. S. 450, 462–463 (which recognizes that apportionment formulae may work especially favorably to domiciliary States). See also *Miller Bros. Co.* v. *Maryland,* 347 U. S. 340, 345. Cf. *Standard Oil Co.* v. *Peck,* 342 U. S. 382, 384.

We find in the decisions no due process barrier to this franchise tax upon a domestic insurance corporation in return for the benefits conferred in the charter. The record does not establish that including in the excise measure these premiums, not subjected to taxation elsewhere, was

---

[8] With respect to foreign corporations, the permissible measures of an excise or franchise tax may be more strictly limited. See *Connecticut Gen. Life Ins. Co.* v. *Johnson,* 303 U. S. 77, 80–82. Cf. *Wisconsin* v. *J. C. Penney Co.* 311 U. S. 435, 441–446; *International Harvester Co.* v. *Evatt,* 329 U. S. 416, 420–422; *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U. S. 450, 464–465.

unreasonable. Indeed, the record does not show that Springfield's own activities (as distinguished from those of AFIA), resulting in the production of these premiums, were not as intimately connected with home office executive direction as with its activities outside Massachusetts. Nothing contrary to our holding is suggested by *Shaffer* v. *Carter*, 252 U. S. 37, in this respect relied upon by Springfield.

4. The decision of the Appellate Tax Board is affirmed. The State Tax Commission is to have costs of this appeal.

*So ordered.*